329 So.2d 145

Eugene Bizell PENDLETON, Jr.

v.

STATE.

6 Div. 881.

Court of Criminal Appeals of Alabama.

March 9, 1976.

J. Louis Wilkinson, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Quentin Q. Brown, Jr., Asst. Atty. Gen., Birmingham, for the State.

HARRIS, Judge.

Appellant was indicted for murder in the first degree in the shotgun slaying of Bobby Alvin Duke, Jr. At arraignment he was represented by court-appointed counsel and pleaded not guilty. He was found guilty of murder in the second degree and the jury fixed his punishment at twenty years in the penitentiary. At the time sentence was imposed he gave notice of appeal but did not request that the sentence be suspended pending appeal. He was furnished a free transcript and trial counsel was appointed to represent him on this appeal.

The evidence in this case is without conflict. Appellant did not testify nor did he offer any testimony in his behalf.

One Hayes Joseph Tooson, alias, was convicted of murder in the first degree in this same case and was sentenced to life imprisonment. Tooson's case was affirmed by this Court on October 1, 1975. 56 Ala.App. 613, 324 So.2d 327, certiorari denied. 294 Ala. ——, 324 So.2d 333.

The evidence from the State tended to show that the deceased left the home of his parents at 328 Killough Drive in the Huffam section of Birmingham at about 3:00 p. m. on July 29, 1974. He was driving a 1973, black over black, Monte Carlo automobile owned by his father but used primarily by his younger brother Tim. Tim testified that he last saw Bobby at their home around 3:00 p. m. on July 29, 1974, and that he was leaving to go to Huffman High School and was driving the Monte Carlo Chevrolet automobile. That Bobby was dressed in red gym shorts, a red tee shirt, black and white football shoes and a red and white visor. He also had a gold chain around his neck and had three rings, and he also had a key ring with several keys on it in addition to the car keys. Tim made the key ring out of leather. All of these items were identified by Tim and introduced in evidence. Tim further testified there were a double barrel shotgun and some shells in the car.

Bobby was seen leaving Huffman High School shortly after 3:00 p. m. He was later seen about 3:40 p. m. at the intersection of the Tarrant-Pinson Highway and Lawson Road at a point not too far from Huffman High School. He was driving the Monte Carlo car at this time.

Bobby was never seen alive again. The Monte Carlo was located in Selma, Alabama, on August 2, 1974. His body was found near Five Mile Creek in a wooded

area in the vicinity of Lawson Road in Jefferson County on the afternoon of August 3, 1974. The body was badly decomposed, but the surgeon who performed the autopsy expressed the opinion that death was caused by shots fired from a shotgun at close range which would have caused death immediately. A shotgun wadding was found in the liver and there were many perforations of the large and small intestines. X-rays of the entire body revealed a total of 491 gunshot pellets and 126 pellets were removed from the body.

The State then put on a succession of coroners, doctors, dentists, and law enforcement officers to effectively establish the corpus delicti and to establish the identity of the deceased.

Mr. Benny Haggins testified that on July 29, 1974, he had been with appellant, Hayes Joe Tooson, Willie Albert, and Mark Spruce. He stated he saw Mark Spruce give appellant a pistol and did not see appellant give him back the pistol. He further stated that he let appellant and Tooson out of his car at Jim Skinner Ford on the afternoon of July 29, 1974, and they said they were going to get a car and rob somebody. That after appellant and Tooson got out of his car he did not see them the rest of the day. He said he then let Mark Spruce and Willie Albert out of his car at the WACO filling station located on the Tarrant-Huffman Highway and went home.

Mr. Tilford Brown testified that on the night of July 29, 1974, appellant told him that Tooson had shot a boy at the Five Mile Creek and the shotgun in the boy's car was burned, and that the body was left near the creek.

The State then put on one Chauncy Worthy who testified that on the night of August 4, 1974, appellant told him that Tooson had done the shooting and that he did not know that Tooson was going to kill this person until it happened. Worthy further testified that appellant told him

they had been hitch-hiking before the shooting and, "He said that if he had known Tooson was going to do it, he would have tried to stop him."

After the case was submitted to the jury, they later returned to the courtroom and requested that they be allowed to hear Worthy's testimony again. With all parties present the trial judge had his Court Reporter read to the jury Worthy's testimony. There was no objection to this procedure. We think it well to quote this testimony.

"EXAMINATION BY MR. RUSSELL:

"Q. State your name, please.

"A. Chauncy Worthy.

"Q. Where do you live, Chauncy?

"A. 6209–60th Avenue, North.

"Q. What section of town is that located in?

"A. Airport.

"Q. Do you know the defendant in this case, Eugene Pendleton?

"A. Yes, I do.

"Q. Do you know a man by the name of Hayes Joseph Tooson?

"A. Yes, I do.

"Q. Do you know a man by the name of Tilford Brown?

"A. Yes, sir.

"Q. Benny Haggins?

"A. Yes, sir.

"Q. Willie Albert Latham?

"A. Yes, I do.

"Q. Mark Spruce?

"A. Yes.

"Q. I direct your attention, Chauncy, to Sunday August 4, 1974—

"A. Yes, sir.

"MR. RUSSELL: Excuse me just a minute.

(Thereupon, ensued an off-the-record discussion, following which the following proceedings were had and done:

"Q. Chauncy, on that Sunday, did you have an occasion to see Eugene Pendleton?

"A. Yes, I did.

"Q. Where were you at the time you saw him?

"A. Down to his cousin's house.

"Q. Talking about Eugene Pendleton's cousin?

"A. Yes.

"Q. What is his name? Do you know?

"A. No. I call him Bud.

"Q. You call him Bud?

"A. Yes.

"Q. Anyone else present at the time?

"A. No.

"Q. Just the three of you?

"A. Just the two of us.

"Q. Bud wasn't there?

"A. No.

"Q. Did Eugene Pendleton tell you at that time—What, if anything, did he tell you at that time?

"A. We were looking at the paper, so—

"Q. Will you speak up a little bit?

"A. We were looking at the paper, and we were talking about it.

"Q. You were looking at the paper?

"A. Reading the paper.

"Q. What paper?

"A. Sunday's paper, I guess it was.

"Q. What story were you reading in the Sunday paper?

"A. About the killing, the Duke.

"Q. The Duke killing?

"A. Yes, sir.

"Q. What did Pendleton say at this time?

"A. He told me that he didn't do it. He told me, you know, that he didn't kill this person. He said Tooson did it.

"Q. He said Tooson did the shooting?

"A. Yes. He said he didn't know—he didn't know that Tooson was going to kill the person.

"Q. Did he say anything about this person, where they had met this person, or anything like that?

"A. He told me they were hitchhiking.

"Q. Speak up.

"A. That they were thumbing a ride.

"Q. Where were they thumbing a ride?

"A. He didn't say where they were coming from.

"Q. What else did he say at that time?

"A. He told me he didn't do it. He said— he just kept telling me he didn't do it.

He said that if he had known Tooson was going to do it he would have tried to stop him.

"Q. Did he tell you what Tooson had done?

"A. He told me that he had killed this boy.

"Q. Did he tell you how he did it?

"A. He told me he shot him.

"Q. What did he say he shot him with?

"A. A shotgun.

"Q. Did he say where he got the shotgun from?

"MR. WILKINSON: Now, we are going to object to him leading and suggesting to the witness, may it please the Court.

If he wants to ask him what the statement was—

"THE COURT: Overrule. He can ask him if—I overrule.

"MR. WILKINSON: We except.

"THE COURT: You can answer.

"MR. RUSSELL: You can answer the question.

"THE WITNESS: Repeat the question.

"Q. Did Eugene Pendleton say where Tooson had got the gun from?

"A. He told me it belongs to the boy.

"Q. Belongs to the boy?

"A. Yes, sir.

"Q. Did he tell you what happened to the gun at that time?

"A. No, sir.

"Q. Let me ask you this:

Was there any conversation about an automobile, about an automobile at that time?

"A. Did we have a conversation about it?

"Q. You and Eugene Pendleton.

"A. I don't understand the question.

"THE COURT: He is asking you if he said anything about an automobile.

The word 'conversation' to some people means one thing and to some, another.

"Q. While you were talking to Eugene Pendleton, did he mention a car, as well as gun?

"A. Yes, sir. He said, 'the boy's car.'

"Q. The 'boy's car?'

"A. Yes.

"Q. Okay. What, if anything, did Pendleton say happened to the car?

"A. He didn't say what happened to the car.

"Q. Did he say who had the car?

"A. He said Tooson left with the car.

"Q. That Tooson went off with the car?

"A. Right."

Thereupon the jury retired to the jury room at 2:50 p. m. and at 4:40 p. m. they returned to the courtroom and announced they had reached a verdict. After the verdict was read, the jury was polled and each juror said it was his or her verdict.

The trial judge charged the jury on the law of murder in the first degree, murder in the second degree, and manslaughter in the first degree. The jury was also charged on the law of conspiracy and a very detailed charge on circumstantial evidence. No exceptions were reserved to the oral charge.

██  The law on aiding or abetting is best expressed in *Stokley v. State*, 254 Ala. 534, 49 So.2d 284, where the Supreme Court said:

"It is well established that when, by prearrangement or on the spur of the moment, two or more persons entered upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose of conspiracy need not be proved by positive testimony. It rarely is so proved. The

jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. *Morris v. State,* 146 Ala. 66, 41 So. 274, and cases cited; *Jones v. State,* 174 Ala. 53, 57 So. 31; *Teague v. State,* 245 Ala. 339, 16 So.2d 877.

"When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. *Jones v. State,* supra; *Jolly v. State,* supra [94 Ala. 19, 10 So. 606]; *Tanner v. State,* 92 Ala. 1, 9 So. 613."

The State's evidence clearly put appellant and Tooson together on the afternoon Bobby Duke, Jr. disappeared. The statement appellant made to Worthy shows beyond peradventure that he was present when the deceased was shot in a wooded area near Five Mile Creek where the body was found on August 3, 1974.

We hold the State's case was strong enough to submit the issue of guilt to the jury for its determination. Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Whether there is such evidence is a question for the Court, its weight and probative value are for the jury. *Bolton v. State,* 21 Ala.App. 373, 108 So. 631; *Haggler v. State,* 49 Ala.App. 259, 270 So. 2d 690; *Hawkins v. State,* 53 Ala.App. 89, 297 So.2d 813.

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the judgment of conviction is affirmed.

AFFIRMED.

All the Judges concur.