348 So.2d 828 (1976)
Jerre CHATOM
v.
STATE.
1 Div. 688.
Court of Criminal Appeals of Alabama.
August 31, 1976.
Rehearing Denied October 26, 1976.
*829 Joseph O. Kulakowski, Thomas J. Stein, Mobile, for appellant.
William J. Baxley, Atty. Gen. and Ellis D. Hanan, Asst. Atty. Gen., for the State.
PER CURIAM.
First degree murder; sentence: life imprisonment.
On November 17, 1975, three deputy sheriffs were shot down from ambush in a rural Mobile County near Wilmer. Two of the deputies died as a result of the shootings. The appellant was indicted, tried and convicted for the murders of the two deputies, Officers Beck and Stoltz. The record is voluminous and consists of 757 pages.
*830 The State's case consisted entirely of circumstantial evidence. At the end of the State's case, the appellant moved to exclude the State's evidence contending that the State failed to make out a prima facie case. Therefore the sufficiency of the evidence is before us.
Near the end of the trial, the trial court admitted into evidence the results of an "atomic absorption test." In order to demonstrate the importance of this test, it is necessary to set out what we perceive to be the permissible inferences that could be drawn from the evidence.
On November 17, 1975, the appellant and Mike Wilson were riding down a country road in Mobile County at approximately 70 miles per hour. A deputy sheriff, Officer Kelso, pursued the appellant and Wilson. Police later determined both were on parole and arrest warrants were outstanding for them. A high speed chase ensued during which the appellant fired several .12 gauge shotgun blasts at Kelso's car. The appellant and Wilson pulled off the main road onto a dirt road which led into a nearly impregnable swamp.
Kelso called in reinforcements. Five law enforcement officers, including Beck and Stoltz came to Kelso's aid. The vehicle in which the appellant was riding was discovered at the edge of the swamp. In addition, various firearms and drug paraphernalia were recovered. While three of the officers were inspecting the evidence, Officers Beck, Stoltz and Morgan entered the swamp. A fierce gun battle ensued in which fifteen to twenty shots were fired within a matter of seconds.
Officer Kelso and the other two officers ran to the swamp which was approximately one hundred yards away. Upon entering the swamp, they heard what sounded like a person running through the swamp. Shortly thereafter, they discovered Beck and Stoltz, who were dead or dying, and Morgan who was wounded in the arm. Morgan said he could not see where the shots were coming from and did not see anyone.
At this time, between two hundred and three hundred law enforcement officers from Alabama and Mississippi converged on the swamp. A helicopter circled the swamp and bloodhounds were brought in from Atmore. When the dogs arrived, the officers entered the swamp and found Wilson's body approximately sixty feet from where the bodies of the slain officers were found. At about the same time that Wilson's body was recovered, the appellant was captured in the state of Mississippi, approximately a mile and a half to two miles across the swamp from the scene of the crime.
An investigation revealed that the shots which killed Beck and Stoltz were fired from a .20 gauge shotgun which was the same as found along with a pistol beside Wilson's body. Appellant was armed with a .12 gauge shotgun and other weapons, which he abandoned in the swamp. Officers found the shotgun where appellant told them he had left it. It was not the same caliber of the murder weapon. Neither the appellant's nor Wilson's fingerprints were found on any of the weapons, but neither was there shown an attempt to preserve fingerprints. The only shots which were fired at the officers came from the direction and vicinity of Wilson's body.
The appellant did not testify at his trial. In statements made to the police, the appellant contends that when he and Wilson entered the swamp, that he told Wilson they should try to go through the swamp. Wilson did not believe they could make it through, and the appellant proceeded without him. The appellant contended to the police that he was at least three-fourths of a mile away when he heard the shooting occur. The shooting took place approximately one hour and twenty minutes after the appellant and Wilson entered the swamp.
The State introduced circumstantial evidence from which it contends that it could be inferred that the appellant's statement was not true, and that he was in fact at the scene of the crime:
(1) An examination of Wilson's body indicated that he was shot at extremely close range and that the wound was probably not *831 self-inflicted. The inference sought by the State was that the appellant shot Wilson before the appellant escaped through the swamp. In closing argument, the defense draws an inference that Wilson was shot by one of the law enforcement officers.
(2) It was also the opinion of the investigators that Wilson could not have moved more than a few feet with the type of wound he received. In addition, the direction of the flow of blood from Wilson's wound indicated that he had not moved after he was shot. The inference sought was that the person running through the swamp after the ambush was the appellant, not Wilson. Inferences which could be drawn under the theory of the defense are that the officers could have heard each other or possibly heard Wilson running before he was shot.
(3) Officers questioning the appellant at the District Attorney's office said that the appellant stated that he had told the arresting officer that Wilson had killed the two deputies. The inference sought from this evidence was that the appellant had to have been at the scene of the crime in order to know that two officers had been killed. The weakness of such an inference is that even if the appellant had been at the scene, it is unlikely that he could have known how many officers had been killed. The evidence was that there was some sixty feet of heavy vegetation between the officers and the point where the shots were fired, and a total of three officers were hit by the gunfire. Such an inference is likewise disputed by direct testimony of the arresting officer as to what the appellant stated at the time of the arrest:
"I'm not armed. I quit. I quit. I quit. I've been running since early this morning and I quit."
It was not until later at the District Attorney's office that the appellant allegedly told his interrogators that upon his arrest he had explained that Wilson was the one who had killed the two deputies.

I
The most damaging evidence against the appellant consisted of the results of an "atomic absorption test." The atomic absorption or gun residue test allegedly will show whether a person has recently fired a gun. The State, by use of the atomic absorption test sought to show that Wilson had not fired a gun on November 17, 1975. If Wilson did not fire a gun on the day in question, then there would be a strong inference that someone else, possibly the appellant, shot Officers Beck and Stoltz.
The State may also have sought to show that Wilson did not commit suicide. Inferences drawn from Wilson's commission or noncommission of suicide appear to be too oblique to have any real bearing on the appellant's guilt or innocence.
Dr. John McDuffie testified that he administered the atomic absorption test to swabs taken from Wilson's body. The test was explained as follows:
"Q. Doctor, who do you work for?
"A. The Alabama Department of Toxicology in Criminal Investigation.
"Q. Where are you located, Doctor.
"A. At Auburn, Alabama.
"Q. How long have you been with the department?
"A. Approximately three years.
"Q. What kind of degrees do you have, please, sir?
"A. I have a B.S. in chemistry from Emory University. I have a Ph.D. from Auburn University.
"Q. Over the past three years have you had an opportunity to work a machine or an examination called atomic absorption?
"A. Yes, I have.
"Q. Explain to the jury what that is, please, sir.
"A. This is a machine that analyzes for certain elements by atomizing the elements due to heat. In other words, what it does is simply vaporize the elements into a light path. Once the elements are in the light path they are picked up by a light path and the machine can analyze as to the amount present or the particular element present based on the particular light beam that you put through it.

*832 "Q. Does this particular test also or will it, along with a number of other things, determine primer residues?
"A. Yes, sir.
* * * * * *
"Q. Do you have an opinion as to whether or not there was any primer residues on these swabs?
"A. Yes, sir.
"Q. What is that opinion?
"A. My tests failed to reveal the presence of certain elements consistent with primer residues.
"Q. Is that consistent with a person not having fired a recently fired weapon?
"A. Yes, sir."
On cross-examination, Dr. McDuffie testified as follows:
"Q. Is this test infallible?
"A. No, sir.
"Q. Have you ever run such a test on Milo Sennett?
"A. I am not certain as to whether I have or not, sir.
"Q. You know who I'm talking about Mr. Milo Sennett?
"A. Yes, sir.
"Q. What is the accuracy percentage of this machine, of this test, in the last survey that you've made?
"A. I'm not certain, sir. On tests that I have run myself where I know a gun has been fired, is that what you're asking. I would guess, sir, it's in the neighborhood of 75 to 80 percent of the time.
"Q. That is all? Seventy-five to eighty percent of the time?
"A. Yes, sir."
The appellant moved to exclude the testimony of Dr. McDuffie, and the trial court reserved its ruling. The appellant then recalled one of the State's witnesses, a State Toxicologist, Milo Sennett. Mr. Sennett testified as follows:
"Q. . . . have you ever heard of the atomic absorption test for primer residue?
"A. Yes, I have.
"Q. Are you familiar with the test?
"A. I am. I know a little bit about it but I wouldn't say that I know a lot about it.
"Q. In connection with your work have you ever undergonein connection with your work in the Department of Toxicology have you ever undergone that test on yourself?
"A. Yes, I have.
"Q. And have you ever undergone that test with a 38 caliber pistol such as that?
"A. I have fired several 38 caliber pistols.
"Q. All right, and whatdid you take a swab of some sort and . . .
"A. Some swabs were taken of my hands.
"Q. All right, and were those in turn examined under the atomic absorption primer residue test?
"A. They were.
"Q. Did it come back affirmative or negative?
"A. On one test that I know about the results came back there was not a significant level of residues on my hand.
"Q. In other words, it was negative?
"A. It was inconclusive.
"Q. Which means did not tell whether you fired a gun or not?
"A. That's correct."
After Mr. Sennett's testimony, the following occurred:
"THE COURT: The only thing that has not been ruled upon is the question of the admissibility of the test performed by Dr. McDuffie. If you have any cases you want submit to me at this time you can go ahead.
* * * * * *
"MR. VALESKA: Your Honor, I can cite to this Court, 50 A.L.R.3d 117, the neutron activation test that was admitted and in that the Court of Appeals for the Second Circuit in New York held that, `The Court noted that a strong showing of unreliability must be made in the trial court,' and we submit that has not been made. We citethere are numerous cases in here, Judge. This is another new *833 type test they use to find bombs in mail. . .
"MR. ALONZO: Judge, this has nothing to do with putting something on a man's hand. This neutron activation, I don't know what that is.
"MR. VALESKA: Well, you didn't know what the other one was either.
"MR. ALONZO: That's right, and you haven't told us . . .
"(Mr. Alonzo and Mr. Valeska speak at once.)
"MR. VALESKA: We submit it to the Court for the Court's perusal if you wish. That's our authority.
"(Cases submitted to the Court.)
"THE COURT: Motion is denied. Gentlemen, you have about 30 minutes."
The State cites three cases which it contends are authority for the admissibility of the results of the atomic absorption test. United States v. Richardson, 6 Cir., 388 F.2d 842 (1968); United States v. Kenaan, 1 Cir., 496 F.2d 181 (1974); State v. Howell, Mo., 524 S.W.2d 11 (1975). The term "atomic absorption" is not mentioned in those cases. Richardson and Kenaan involved the dusting of certain objects with fluorescein powder which would show up under ultraviolet light on the hand of one who had handled the object. Howell, however, did involve a test used to determine gun residue. The issue in the above cases was not the accuracy of the test, but rather whether the test violated the defendants' rights under the Fourth Amendment.
The only precedential value of the above cases to the case at hand is contained in Howell. In discussing the issue of exigent circumstances, the Missouri Court made the following statement:
"It is noted that in order for a gun residue test to produce any valid results positive or negativeit probably must be done promptly as the residue on one's hand will probably disappear in the normal course of living or by being rubbed off of the hand. We say `probably' because this is a matter about which the court is not certain. . . ."
In the present case, there was no testimony concerning the exact time that the swabs were taken from Wilson's body. In addition there was no testimony indicating the lapse of time between the shooting or the taking of the swabs, and the time when Dr. McDuffie tested the swabs for gun residue. Needless to say, we are totally without knowledge as to what effect a delay would have on the accuracy of the test. In addition there is no testimony that the 75% to 80% figure would apply to a shotgun as opposed to a pistol where the muzzle is in close proximity to the hand. Thus, the accuracy of the test was not sufficiently established by the State.
The State's attorney cited 50 A.L. R.3d 117 to the trial judge as authority for admitting the results of the atomic absorption test. That A.L.R. annotation deals with the admissibility of the "neutron activation analysis" test. The only possible precedential value that such a citation has is to show that new scientific techniques, such as the neutron activation analysis test, are gaining acceptance in some jurisdictions in the United States. The atomic absorption test and the neutron activation analysis test are two completely different tests. The neutron activation analysis test requires much more sophisticated instruments, has a considerably higher sensitivity for most elements and is more precise. The gunshot residue test used in the present case is similar to that using neutron activation analyses, but it lacks the sensitivity of the neutron activation analysis approach. 22 Proof of Facts, Instrumental Analysis, 476; 15 Proof of Facts, Neutron Activation Analysis, 115, and pocket part thereto.
Alabama has in the past been quite strict regarding the admissibility of scientific experiments. Myrick v. City of Montgomery, 54 Ala.App. 5, 304 So.2d 247, cert. denied 293 Ala. 768, 304 So.2d 248 (1974). Myrick dealt with the admissibility of the results of a chemical breath analysis test. Traditionally such a test had been held inadmissible in Alabama. The "Alabama Chemical Test for Intoxication Act", No. 699, September 11, 1969, § 2, made certain chemical analysis *834 admissible into evidence. Myrick held the validity of such analyses was conditioned on the performance of the test according to certain prescribed methods by a person with a valid permit to perform such a test.
We have not been cited a case where the results of an atomic absorption test have been admitted to prove that a person did not fire a gun. We would, however, most likely admit the results of such a test if the proper predicate was laid and if it was relevant. We will certainly require more information than that contained in Dr. McDuffie's testimony. The accuracy of the test must be established. All of the variables that effect the accuracy of the test must be accounted for and explained. The competency of the person, who gives the test, to explain the results must be established by more than a mere assertion that he has had an opportunity to operate such a machine.
The qualifying question to Dr. McDuffie was:
"Over the past three years have you had an opportunity to work a machine or an examination called atomic absorption?"
That question and his affirmative answer tell us nothing. During the past three years, how many times did he perform the test or operate the machine? Does he operate the machine correctly? What are the standards for operation of the machine or test? These are questions which the record fails to answer. Likewise, when and under what conditions were the swabs taken of the deceased's hand? Had the hands been preserved from the time the deceased died until the swabs were taken?
James L. Small, a State Toxicologist, testified that he took the swabs of the deceased's hands at the time of the autopsy and also a swab was taken from the shotgun shell and a .38 caliber spent cartridge found at the scene of the shooting. He stated that he placed the swabs in a sealed envelope and mailed it to Dr. John McDuffie by certified mail. Dr. McDuffie testified that he received the swabs in a sealed envelope from the mail and ran the atomic absorption test on them. He never distinguished between the swabs taken from the hands of the deceased and swabs taken of the shotgun shell and spent cartridge.
The trial court had before it no criteria for administration of the test, "and consequently was unable to ascertain standards against which the evidence could be measured." Ex parte Patton v. City of Decatur, Ala., 337 So.2d 321 (1976).
In commenting on another scientific test, the "Breath Alcohol Tests," the New Jersey Superior Court stated what we think is a correct principle: ". . . As a minimum, however, the State should prove (unless such proof is waived) that the operator was qualified, that the machine and its components were in proper condition, and that the test was properly administered. . . ." State v. Miller, 64 N.J.Super. 262, 165 A.2d 829 (1960).
Likewise see: People v. Morse, 325 Mich. 270, 38 N.W.2d 322 (1949) and cases cited therein.
Scientific experiments are helpful and often crucial in the investigation of crime. However, the potential for confusion and prejudice in the minds of the jurors in great. This is especially true when the relevance of the experiment to the issues is not clear. The State did not lay the proper predicate for the admission of the atomic absorption test in the present case, and the appellant's motion to exclude should not have been denied.

II
We are not certain we have listed all of the permissible inferences that the State sought to draw from the evidence. If the appellant is again tried for the murders of Officers Beck and Stoltz, there must be sufficient evidence presented to establish beyond a reasonable doubt that he shot Beck and Stoltz or that he aided or abetted Wilson in shooting them per Title 14, § 14, Code of Alabama 1940.
The leading case in this area is Stokley v. State, 254 Ala. 534, 49 So.2d 284 *835 (1950). The broad general statements made in Stokley should be read in the context of the facts present in Stokley. The evidence in Stokley is infinitely stronger than the evidence which we perceive has been presented in the present case. Circumstantial evidence is certainly as good as direct evidence, but the mere presence of a suspect at the scene of a crime without proof that he either participated or encouraged the principal is not sufficient to establish his guilt.
A somewhat analogous situation arises in the case of Sweat v. State, 57 Ala.App. 143, 326 So.2d 671, cert, denied (for failure to comply with Supreme Court rules) 295 Ala. 424, 326 So.2d 674 (1975). There a defendant was seen in a building with a pistol in hand, in the presence of two other burglars. The evidence was held to be insufficient to sustain a guilty verdict of assaulting a police officer with a deadly weapon, where no one witnessed the shooting. There the three burglars were attempting to flee in separate directions when someone fired, but there was no evidence presented as to which one fired the shot.
In the instant case, viewing the evidence most favorably for the State, we find:
(1) Appellant was not seen at the scene of the crime at the time of the shooting. One hour and twenty minutes had elapsed between the flight of the fugitives into the swamp and the actual shooting.
(2) No witness saw the shooting, and consequently, no one saw the appellant fire the fatal shot.
(3) Appellant testified that he was three-quarters of a mile away when he heard the shots.
(4) Appellant was arrested some one and one-half to two miles away, across the swamp in Mississippi.
(5) The murder weapon was testified to be a .20 gauge shotgun.
(6) A .20 gauge shotgun was found by the body of Wilson.
(7) Appellant was armed with a .12 gauge shotgun which he abandoned in the swamp, and which officers found where he told them it was located. It was found at a point between the entrance to the swamp and the location of the officers' bodies, giving rise to the compelling inference that he had abandoned the shotgun before the shootout occurred.
(8) The fatal shots all came from the direction and vicinity of Wilson's body.
Thus, viewing the evidence in its most favorable light for the State, the circumstantial evidence here does not point toward the appellant as the person who fired the fatal shots. Instead, it strongly points toward Wilson. Unless circumstantial evidence is sufficiently strong to point toward the appellant as the guilty party, it is insufficient, standing alone, to support a conviction.
The record as we perceive it, minus the results of the atomic absorption test, would not support a conviction for murder. Even if the results of the test were properly presented and admissible, there would be an extremely close question as to whether a prima facie case had been established.
We pretermit other issues raised in light of the result we reach. Hopefully on a new trial, the same questions will not arise.

REVERSED AND REMANDED.
All the Judges concur except DeCARLO, J., dissents.
DeCARLO, Judge (dissenting):
It has been held in this State that a conspiracy can be formed on the spur of the moment. Further, when a conspiracy is entered to commit an unlawful act, the conspirators are responsible for all that is said and done by the co-conspirators, pursuant to the conspiracy. Martin v. State, 89 Ala. 115, 8 So. 23; Stokley, supra; see also cases cited in Annot. 15 A.L.R. 456 (1921).
The record here indicates that the accused and his companion, Wilson, were driving at a high rate of speed when Officer Kelso started following them. As Kelso attempted to catch up with their speeding vehicle, they increased the car's speed and moved further away from the police car.
*836 At that point, Kelso turned on his blue lights and siren and notified the sheriff's department that he was chasing the vehicle.
According to Kelso, at times the speeding vehicle approached the speed of one hundred miles per hour. He said that during the chase the appellant, who was the passenger in that car, turned and began firing a shotgun at the police car. The first blast blew out "the rear windshield" of the "Chevrolet Blazer," the appellant was in, and destroyed half of the windshield of the police car. The officer said a total of three shotgun blasts were fired by the appellant.
Officer Kelso stated that: ". . . approximately 80 something shots hit the car, and out of that bunch from my bumper straight up my side to my blue lights there was only four or five shots hit the passenger's side of the car. . . . Everything was to the driver's side from my bumper up to the blue light, starting from the left front tire." Further he said that both front head lights were blown out and the shield on the left side of the blue light was "shot through." According to Kelso, the chrome ring that held the blue shield was "shot up also," and the hole in the shield appeared to be the size of a "buckshot."
The car was subsequently abandoned near a swamp and after additional police arrived, the chase was resumed.
Officer Kelso testified that after the volley of shots were fired which killed the two officers, he heard someone running away from the spot where the shooting occurred. Although it was not specifically shown that the appellant or his companion fired the fatal shots, the fact remains they were both attempting to escape apprehension after firing on the police car. When the appellant and his companion stopped their car during the chase, they both left the car and entered the nearby swamp. It was approximately thirty minutes afterwards that the firing began and shortly thereafter the dead officers were found.
It appears from the majority opinion that the appellant and Wilson were in the swamp at the time the officers were shot. Even though the appellant said he had separated from Wilson before the shooting, nevertheless, he was a party to the conspiracy and under the circumstance he was responsible for the acts committed by his co-conspirator in their attempt to escape. Stokley, supra. See: Tolbert v. State, 71 Miss. 179, 14 So. 462, 42 Am.St.Rep. 454.
No one else was seen entering the swamp or near the location where the firing was heard and the appellant was the only one arrested in the vicinity of the swamp. Further, the wounds found on the bodies of the dead deputies were caused by the weapon found near Wilson's body.
Though it may be true that the appellant left Wilson and did not actively participate in the shooting, this would not be a defense. He was armed and prepared to shoot. In any event, he was a party to the conspiracy from its inception and for ought that appears he was a party at the time of his apprehension.
In my judgment it will be difficult to find a stronger case of circumstantial evidence and one so conclusively showing the appellant or his companion did the shooting. Compare: Harnage v. State, 49 Ala.App. 563, 274 So.2d 333; 290 Ala. 142, 274 So.2d 352; Cronnon v. State, 56 Ala.App. 192, 320 So.2d 697; Hoback v. State, Ala.Cr.App., 338 So.2d 439, 1976; Pendleton v. State, 58 Ala.App. 454, 329 So.2d 145; Stinson v. State, 55 Ala.App. 629, 318 So.2d 325. In the case at bar, there is no fact or circumstance in the evidence tending to cast suspicion upon anyone else as the murderers. On the contrary, all the facts proved are incompatible with the innocence of the appellant, and incapable of explanation upon any hypothesis other than the guilt of him and his companion.
Irrespective of whether the appellant or Wilson actually fired the shots which killed the two officers, and wounded another, there were equally guilty of murder, the reason being that they were jointly engaged in a conspiracy to escape after assaulting a police officer with a deadly weapon during the initial pursuit.
*837 The killing was the foreseeable result of this illegal purpose. Thus, all of the joint participants were equally guilty of murder under the law.
Under the circumstances, Chatom would be equally guilty with Wilson of the murder of the deputies even if he did not personally inflict the fatal wounds. Our law says the acts of Wilson in the matter were the acts of the appellant also.
In view of these circumstances, the introduction of the "atomic absorption test" results, though apparently improperly predicated, would not have been prejudicial to this appellant.
The conspiracy evidence apart from the test results were sufficient to sustain the jury's verdict.
For these reasons, I respectfully dissent.

ON REHEARING
PER CURIAM.
To clarify this opinion and make the holding of this Court explicit, we make two points:
First, the conviction of appellant was not reversed due to insufficiency of the evidence.
Secondly, reversal was due to the introduction into evidence of the atomic absorption test without a proper predicate.
We can perceive under no stretch of the imagination how admission of the unpredicated test could be proper. Our opinion on that point is clear and unequivocal. However, the dissent and the State's brief on rehearing suggest that the circumstantial evidence was sufficient to go to the jury under the conspiracy theory and thus admission of the test resulted in harmless error (Rule 45, A.R.A.P.) We disagree.
In deciding whether error is prejudicial, we may not merely determine that other evidence presented is sufficient for conviction and then disregard the illegal evidence. If this was the case, prosecutors could fill the record with all types of prejudicial hearsay, irrelevant and unpredicated material, and never suffer a reversal if in addition thereto they made out a prima facie case.
Juries in criminal cases do not function under the "equity rule" where it is assumed that they disregard illegal evidence and base their verdict solely on the legal evidence, as a judge sitting in equity does.
Here, the jury may have been unimpressed with the circumstantial evidence as to the conspiracy theory, but may have seized upon the scientific test results. They may have very well concluded from the test that Wilson did not fire a weapon and that appellant therefore personally murdered the deputies and Wilson. That they may have based their verdict on the test, or given it great weight in arriving at their verdict, cannot be said to be nonprejudicial or immaterial.
Appellate courts must reverse convictions where, over proper objection, evidence of a material and prejudicial nature to an accused is wrongfully admitted.
Section II of the opinion was intended as a helpful comment, directed to the District Attorney, pointing out obvious weaknesses in the remaining circumstantial evidence at the first trial. By those comments, we have not given an advisory opinion as to our holding on a subsequent appeal if a retrial results in conviction. It is entirely possible that, upon a proper presentation of the evidence in a new trial, the prosecution may meet its burden of proof.
We emphasize that reversal results solely from admission of the improperly predicated test. On retrial, the prosecution should pay more careful attention to the established rules of evidence.
OPINION EXTENDED; APPLICATION OVERRULED.
CATES, P. J., and TYSON and BOOKOUT, JJ., concur.
HARRIS and DeCARLO, JJ., dissent.
HARRIS, J., files dissenting opinion.
*838 HARRIS, Judge (dissenting):
Upon further consideration of the entire four-volume record in this case I would grant the application for rehearing and affirm the conviction.
In the majority opinion it is stated: "The record as we perceive it, minus the results of the atomic absorption test, would not support a conviction for murder. Even if the results of the test were properly presented and admissible, there would be an extremely close question as to whether a prima facie case had been established."
The above broad statement, in my judgment, does not find support in the record. I believe that Judge DeCarlo, in his dissenting opinion, succinctly stated the law applicable to this case.
I, therefore, respectfully dissent.