LEIGH M. CLARK, Retired Circuit Judge.
A jury found defendant (appellant) guilty as charged in an indictment as follows:
“... Walter Samuel James and, Larry Connell James, alias Sam Hill whose names are to the Grand Jury otherwise unknown did, in the course of committing a theft of property of Winn Dixie, Inc., a corporation, threaten the imminent use of force against the person of Tony Alcu-ri, with the intent to compel acquiescence to the taking or of escaping with the property, while one of said defendants was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-8-41 of the Code of Alabama....”
Prior to the commencement of the trial of the case upon which this appeal is based, there was a severance of the case against this appellant from the case against the other defendant. Neither defendant testified on the trial of the case now under consideration.
The evidence for the State consisted of testimony of the alleged victim, Tony Alcu-ri, an employee of Winn-Dixie, and Mrs. Ruby Lee Potts, another employee of Winn-Dixie, who were both working at Winn-Dixie in Troy Plaza on the evening of April 4, 1983, when the incident under consideration occurred at about 6:30 or 7:00. Both of said witnesses identified this appellant as a person who was in the store, who *880 purchased a package of gum, paid for it at the check-out counter, and left the store at about closing time, 9:00 P.M., or a few moments before the law enforcement authorities were alerted as to what had occurred.
According to the testimony of Tony Alcu-ri, he had two conversations with Walter Samuel James, appellant’s co-defendant, in the store on the evening of April 4, 1983. He testified that the first conversation was about 7:30 P.M. He detailed his first conversation with Walter Samuel James as follows:
“... Most of the incident started around 7:30 when a little short black guy [whom he identified as Walter Samuel James] came in and asked me about his grandmother’s check, that he wanted to pick it up. And that day I had went through the bad checks and he told me the name, but I realized that the check was not in the office. And I told him that, well, to go back home and get the letter that we had sent him and I could probably find out where the check was at or what was going on.”
Immediately after giving the testimony quoted above, the witness testified as to the second conversation he had with Walter Samuel James as follows:
“And so around five minutes to 9:00, right at closing time, he came back in and I was just coming out of the office. And he had fifteen dollars in his hand. And a lot of people will — once they find out they’ve got a check in the office they’ll want to pay the check off before they — you know — before we send it back to the bank or sign a warrant on them. And I thought that was what he was wanting to do. And so I walked over there and when I walked over there he leaned over towards me. He says you see that black guy over there at the register, and I just looked over and I said yeah, I see him. He says, he’s got a .357 magnum, he’ll blow your brains out if you don’t do what he says do and no start no — [vulgar word omitted]. And during the time that he was telling me that he was between two customers who — I would say the ladies were in their forties — and at one register there was some people being checked out. And the customers walked towards me and I stepped out of the customers’ way because I had presumed then that I was fixing to be robbed. And so I just stepped out of the way of the customers and — I thought the little guy was right behind me. I was so scared. And I walked towards the office — well, on Mondays we have a mop crew that comes in, and they are big sized dudes, you know, men. And one of them asked me a question. And as I was walking toward the— you know — past the number one register and past number two register, well the mop men were at the number three register. When the guy asked me a question I was looking at this guy, his appearance and all. And — to get more or less a description of his build and his clothes. And he — I started talking to them. And I noticed out of the corner of my eye, I figured if I ever — if this guy ever saw me looking at him he would know that this little guy — and anyway he would know that I know what was going on. And I didn’t want nobody — .”
Officers of the Troy Police Department testified as to their apprehension of both defendants on April 4, 1983, soon after they left the Winn-Dixie store. Among the officers testifying was Officer Ken Johnson. He said that after he arrived at the store and had been informed as to what had happened, he decided to “check the other businesses in the area,” and he then went to Southland Village Shopping Center. He testified in detail:
“I entered from the northeast driveway area there by the Western Sizzler and proceeded diagonally across the parking lot, at which time I noticed a black male [subsequently identified as Walter Samuel James] in a silver Caprice Chevrolet crunched down behind the driver’s steering wheel. I took note of it because it was parked out there in the middle of the parking lot near no businesses. I proceeded to the far side of the Piggly-Wig- *881 gly Store and observed a black male [subsequently identified as this appellant], tall black male wearing a blue windbreaker, blue jeans, afro haircut, carrying a sack exiting the store. At this time I called down at Officer Clower who had contacted the original complainant and described him to Officer Clower and wanted him to confirm if or not the subject matched the description that he was taking down there at the original scene. In just a moment he came back and advised that the manager of that store said yes, that he matched the description of one of the persons that had entered the store.
“Q. What did you do after that?
“A. I stopped — I stopped the men about halfway across the parking lot and identified myself as a police officer. From reviewing my reports written that night, I identified myself and asked if I might see some identification. Suspect asked why. I replied that I was conducting an investigation involving a person matching his description. Suspect then complied and furnished me with some kind of artificial document resembling a birth certificate.
“Q. Okay. I want to show you what has been previously admitted as State’s Exhibit 1. I ask you, is that the document that he represented to you at that time?
“A. Yes, sir. It is.
“Q. And what name does it have on it?
“A. Sam Hill.
“Q. Is that who he identified himself to be?
“A. The first time, yes, sir.
“Q. All right. And after he gave you that what did you do?
“A. I noticed then that the silver Caprice behind him at this time — we was walking in a line towards it, was starting up and leaving. I advised another car in the area that was transpiring to see if they could get it stopped.”
In continuing his testimony, Officer Ken Johnson said that he talked with the appellant, alias Sam Hill, and with a female by the name of Kitchens, who had been in an automobile parked near the Caprice, the automobile toward which the appellant had been walking. Upon his being questioned as to the conversation among the officer and the appellant and Miss Kitchens, Officer Johnson further testified:
“First of all I asked her for identification and she supplied me a Georgia’s driver’s license, or what appeared to be a Georgia driver’s license. I advised her that we were conducting an investigation and that this man was a possible suspect. I advised her of her constitutional rights. She signed the card. Then I asked her if she would be willing to come to the police department for further investigation and she said yes, that she would.”
Lieutenant Don Brown, of the Troy Police Department, was the next witness for the State. He testified that he interviewed appellant and Agnes Kitchens promptly after they were questioned by Officer Johnson and that they all then went from the parking lot to the police station, where after the Miranda rights and warnings had been given, the appellant gave the officer the following oral account of what had recently transpired:
“... He told me that they were coming to Troy from the south in a car — he said he was in a car with a black female named Agnes. Said he had met her in Atlanta a couple of months ago. Said he got up with her, Saturday night, I believe he said, down in Palm Beach, Florida. That she had picked him up at 808 East Street there in Florida and they came north and they were going to Atlanta and were going to stop in Montgomery to see a girl. They made one stop south of Troy at a gas station. He doesn’t remember exactly where. Then stopped at the Winn-Dixie. That he went in Winn-Dixie by himself to buy some fruit. That inside the store he saw that the fruit didn’t look good so he bought a pack of chewing gum and left. He was there six or seven minutes. He said he left the Winn-Dixie Store with the black female and went to Southland Village. He left *882 the car and went to the Piggly Wiggly and bought two apples. And that when he came out that’s when the police approached him.
“Q. Did you ask him whether he was traveling with anybody else or not?
“A. Yes, sir. I did.
“Q. What did you ask him and what did he say.
“A. He said — were you and this lady traveling with another individual, a black male in another car or anybody else and he said no.
“Q. Said he was not traveling with anybody else or with another car?
“A. That’s true.
“Q. Now, in this investigation, we know that there was a silver Caprice that was later stopped by the Troy Police Department. Do you know the identity of the person who was driving that silver Caprice that was stopped?
“A. Yes, sir. I do.
“Q. Who was that?
“A. A black male named Walter Samuel James.
“Q. Subsequent to this conversation with Mr. Hill, did you have another occasion to talk with him?
“A. Yes, sir. I believe it was the next day. I went upstairs, word was sent by Mr. James through the jailer, I believe, or through the dispatcher, that he requested to see one of the investigators. At which time Sgt. Louis Fanning who works with me spoke with the individual and I walked in as he was finishing reading him his rights.
“Q. And what was said during that conversation?
“A. He told us that his real name was Larry Connell James. And gave us his correct date of birth, et cetera. And he said the reason he didn’t want to tell us his name to start with was because of, I believe Walter Samuel James. It would get him into more trouble, and due to his past record it would get him into trouble, also.”
Officer Louis Fanning testified that he participated in the arrest and imprisonment of Larry Connell James on the evening of the incident under consideration and at the time he was being booked in jail under the name of “Sam Hill.” He further testified that he talked with the appellant a “second time” when the witness “came in one morning and one of the jailers told me that Mr. Hill wanted to talk to a detective.” He further testified:
“Q. What did Mr. Hill or Mr. James say to you during this second meeting?
“A. I — after I had read him his rights and everything I asked him what did he want to talk about. And he said that he wanted to give me his real name.
“Q. Okay. Did he?
“A. Yes, sir.
“Q. What name did he give you?
“A. He gave me Larry Connell James.
“Q. Did he say anything else to you?
“A. Well, I asked him why he had given us the false name to start with and he said that he was trying to protect Walter Samuel. That he had — Mr. Connell James had a criminal record and that he did not want to make Walter look any worse or whatever by his association or whatever with him. And he said that Walter Samuel had told him, don’t worry about me, you know, I’ll take care of myself, just, you know, take care of yourself. So he decided then to just go ahead and tell us the right name.
“Q. Did he mention who he was traveling with?
“A. I asked him about his relationship with Miss Kitchens. And he said that Miss Kitchens was not his girl friend, that she was Walter Samuel’s girl friend.
“Q. Did he say that she was traveling with Walter Samuel?
“A. Yes, sir.”
During cross-examination of Officer Fanning, he testified:
“Q. Did Mr. Larry James give you any explanation as to how they were traveling or where they were coming from?
“A. I believe he told me that the three of them [Miss Kitchens, Walter Samuel James and this appellant] had spent the *883 night in Valdosta, Georgia, the night before, coming to Troy. I would have to cheek the supplement report on that interview.
“Q. Did he say where they were going?
“A. No, sir. I can’t recall that they said what their destination was.
“Q. For the purpose of recollecting, I would like to let you look at this just for a moment. This being a question and answer period with you and you made a statement here what Mr. James told you. Will you read that please?
“A. Are you talking about this answer here?
“Q. Yes, sir.
“A. ‘Yes, sir. Because it says Sam Hill. He told me, Mr. James told me. I cannot remember exactly all of the places that they went to in sequence, but he said they went. But he told me that Walter Samuel told him that he had violated his parole and that the law was looking for. them. And they were planning on going up to Atlanta and having a nice weekend and then he said that Walter Samuel was going to give himself up. — ’ Do you want me to go on?
“Q. Yeah, go on.
“A. And ‘ — he said that they were going to have kind of one last night weekend together. He also stated to me that he has not seen him in six years, I think.’ ”
I.
By the first issue presented in appellant’s brief, it is contended that the trial court erred in not granting the defendant’s motion for judgment of acquittal and in not granting defendant’s motion for a new trial. Appellant’s attorney presents a strong argument in favor of this issue. He commences his argument as follows:
“The case against the appellant, Larry Connell James, is based entirely on circumstantial evidence. Briefly that evidence consists of the following:
“1. The appellant traveled to Troy with Walter Samuel James;
“2. The appellant was seen in the Winn-Dixie store prior to Walter James’ action at the time of Walter James’ action;
“3. The appellant stopped momentarily as if to look for someone when he was departing the Winn-Dixie store;
“4. The appellant’s action in giving a false name and denying association with Walter Samuel James when first arrested.”
We agree with the first sentence that the case against this appellant “is based entirely on circumstantial evidence.” We add to item 2 of the circumstantial evidence summarized in appellant’s brief what Mr. Alcu-rie stated this appellant stated to him, as quoted hereinabove in directing Mr. Alcu-rie’s attention more closely to Walter Samuel James, by saying “He’s got a .357 Magnum, he’ll blow your brains out if you don’t do exactly what he says do.” We are in further accord with the principle of law relied upon by appellant’s counsel, as has been repeatedly held since its pronouncement by Justice Stone in Ex parte Acree, 63 Ala. 234 (1879). However, we are not persuaded by the argument of appellant’s counsel that the circumstances “do not show more than an association with a guilty party, Walter Samuel James,” who is referred to in the brief as a cousin of this appellant. The circumstances strongly indicate that this appellant was working in concert with his cousin in the ensuing conduct of both whereby they were attempting to steal merchandise or other personal property of value in the Winn-Dixie Store.
Although the pistol referred to in the evidence as being in the possession of Walter Samuel James was never observed by Mr. Alcurie or any other employee or agent of the store, the existence and description thereof by the appellant in talking with Mr. Alcurie met the requirement of showing that appellant’s cousin was “armed with a deadly weapon” as set forth in § 13A-8-41 of the Criminal Code as qualified by § 13A-8-41(b) as follows:
“Possession then and there of an article used or fashioned in a manner to lead *884 any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or by any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.”
In our opinion, a jury question was presented as to whether this appellant was guilty as a principal, or as an aider or abettor of his cousin, of robbery in the first degree and that the verdict of the jury finding him guilty thereof was not contrary to the great weight of the evidence. Any notion that a “taking” is required to sustain a conviction of the statutory crime of robbery in the first degree, as defined in Alabama Criminal Code, § 13A-8-41, is incorrect, as decided in Grace v. State, per Judge DeCarlo, Ala.Cr.App., 431 So.2d 1331, 1333 (1982), cert. quashed, Ala., 431 So.2d 1331, wherein it is stated:
“The present robbery statutes, however, do not require a ‘taking’ of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App.1981); Ala.Code §§ 13A-8-40 through 13A-8-44 (1975) (Commentary), .... The operative words of the current robbery statute are ‘in the course of committing a theft,’ which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual ‘taking from the person.’ ”
II.
Appellant asserts that “the judge erred in denying appellant’s jury charges, Number 11, Number 12, Number 13, and Number 14.” He sets forth in his brief the language of each charge and the authority relied upon by him in support of his position that the court “erred in denying” such charges which we now quote:

“Defense charge 11:

“ ‘Mere presence of suspect at scene of crime without proof he either participated or encouraged the principal is not sufficient to establish guilt.’ Chapman [Chatom] v. State, 348 So.2d 828.

“Defense charge 12:

“ ‘Knowledge of the commission of a felony, after its commission without aid being rendered to the active felon in the commission of the felony, is not sufficient to authorize that conviction.’ James v. State, 351 So.2d 693.

“Defense charge 13:

“ ‘To make a defendant a principal or an accessory the State must adduce some legal evidence implying that he either recuited [sic], helped or counselled in preparing the theft or took or undertook some part of its commission.’ Pugh v. State, 42 Ala.App. 499.

“Defense charge 14:

“ ‘Crime of aiding and abetting .is one requiring specific intent, and mere association, as opposed to participation is not sufficient to establish guilt, nor is mere presence at scene of crime alone sufficient to sustain the burden of proof the government bears.’ United States v. Kelton, 446 F.2d 669.”
We do not question the correctness of the principle of law asserted in any of the four requested written charges. However, it is to be observed that in none of the cases cited was it decided that the quoted principle of law should have been given as an instruction to the jury.
Defendant’s Charge 11 is both argumentative and misleading. It is argumentative in the use of the adjective “mere” and misleading in the suggestion that the defendant was not a participant in the alleged crime. In the absence of any testimony from either this appellant or his co-defendant, it cannot be determined with reasonable certainty that Walter Samuel James was the sole principal and that this appellant was merely an abettor.
Defendant’s requested Charge 12 is misleading in its tendency to assume incorrectly that there was no evidence of any knowledge by this appellant of the commission of a felony until after the felony was committed. The testimony as to what this appellant said as to what his co-defendant was in the process of threatening to do with a pistol is in conflict with such an assumption.
*885 Defendant’s requested Charge 13 is misleading in its tendency to assume that this appellant did not take any part in the actual commission of the alleged crime.
Defendant’s Charge 14 is argumentative by reason of its employment of the adjective “mere” twice and the adverb “alone” as a modifier of the adjective “sufficient” and is confusing in its tendency to assume that this appellant’s co-defendant was more of a principal than appellant.
The trial court was not in error in refusing any' of defendant’s requested charges, 11, 12, 13 and 14.
III.
In his caption to the third contention for a reversal in appellant’s brief, he says, “The judge erred in his manner of answering the questions of the jury.” His argument in its entirety is as follows:
“In this case the Judge answered the jurors’ questions, about whether a gun was found or not, by reading them the statutes defining robbery and the indictment. In East v. State, 339 So.2d 1104, the court held:
“ ‘When jury calls for additional instructions and clearly delineates area of its request, it is usually better for trial court to remain within such area.’
“In the present case the evidence on which the jury had to deliberate was so little, it was extremely prejudicial to emphasize a portion of the instructions most favorable to the prosecution. To lessen the prejudicial effect it would have required an additional charge on the theory of aiding and abetting, since this was the only theory on which a conviction could support this argument in Flowers v. State, 402 So.2d 1118, by saying [sic]:
“ ‘Trial court should admonish the jury that additional instructions must be regarded with all other instructions given.’
“The court made mention of ‘other principles of law’ but did not place the proper emphasis on them that the facts of this case would require.’ ”
We. have some difficulty in understanding fully the position taken by appellant in his brief argument as to the third contention for a reversal. It is directed at a colloquy between the trial judge and a juror after the jury had retired to the jury room and continued deliberation in the case and was brought back to the courtroom at the request of the jury, where the following occurred:
“THE COURT: Ladies and gentlemen, anything we say to each other has to be done on the record and has to be done back in the courtroom and has to be done in front of everyone. So—
“A JUROR: We wanted some clarification on the weapon. Was there a weapon, and if so, was it found — I mean, who had the weapon, if there was one?
“THE COURT: All right, sir. The only thing I can say to you is that we can’t answer the question for you for this reason. If there was a weapon or if there was not a weapon would be for you to determine from the evidence.
“A JUROR: Well, it wasn’t presented. I mean, it was mentioned, but — why wasn’t it — or if there was one why wasn’t it in these cars and things?
“THE COURT: All right, sir. That would be for you to determine. I’ll go a step further if it will help you any and I would ask you to listen — I mean, if it would help you any, I am not suggesting it, but if it would help you any, I’ll tell you what the charge of robbery says, again. If you would like that done?
“THE JUROR: Are you talking about the indictment?
“THE COURT: Well, no — well, that too, if you want that.
“THE JUROR: Well, let’s hear that.
“THE COURT: I can tell you what the Code Section says, again, on robbery in the 1st degree. If you want that.
“THE JUROR: Well, wasn’t there some mention of a weapon in the testimony? Could we hear that again?
“THE COURT: Well, sir, no, you can’t, because that’s for you to determine based on what you heard and based on *886 what inference you give to the testimony.
“THE JUROR: Could we hear the indictment again?
“THE COURT: Yes, sir. And like I said, if it would help you any I will tell you again what the law says robbery in the 1st degree is. I see some jurors nodding their heads that they would like to hear that. The indictment — and I’ve got to go a step further, too, to say this in order to be fair to everyone, keeping in mind that the indictment itself is not evidence. That is just the manner by which it comes up for trial.”
The trial court then for almost a page of the transcript recited the language of the indictment, including the words “in violation of Section 13A-8-41 of the Code of Alabama,” and concluded its instructions to the jury as follows:
. It’s for you to determine from the evidence if the defendant had the pistol that you have the question about or what you determine the pistol had to do with it, if anything, under this Code Section. “And I would caution you, ladies and gentlemen, this. What I have just read to you, also keep in mind all of the other principles of law that I gave you earlier. They also bear on the case and are to be considered by you in addition to what I have just given to you again. Fair enough?”
The jury then retired to the jury room for further deliberation, and counsel for the defendant promptly made the following statement:
“The defense objects to the explanation as given by the court upon the request of the jury in that the entire charge was not read again to the jury as presented the first time. That the material was isolated and pointed to particular questions and — which would result in prejudicial emphasis being placed on those particular points of law.”
It is not for us to criticize either the State or the defense for the failure of the evidence to show whether the pistol was ever found upon or about the defendant, and we can understand the inquiry of the jury on the subject, but we are convinced that the trial court was correct and impartial in the language employed by it to answer the inquiry. We find nothing in either of the cases cited by appellant to support his contention that the trial judge was in error “in his manner of answering the questions of the jury” and conclude that appellant’s third contention for reversal is without merit.
IV.
By the final issue presented in appellant’s brief, appellant says, “The Judge erred in using Exhibit 1 as evidence of prior convictions during sentencing of appellant under Alabama Habitual Felony Offender Act.” The State gave due notice that it would proceed against defendant under the Habitual Felony Offenders Act and introduced evidence of two previous felony convictions that occurred in the state of Florida. Alabama Criminal Code § 13A-5-9(b)(3) provides that “In all cases when it is shown that a criminal defendant has been previously convicted of any two felonies and after such conviction has committed another felony,” and that such other conviction is for a Class A felony, he must “be punished by imprisonment for life or for any term of not less than 99 years.” § 13A-5-9(a)(3) provides that on conviction of a Class A felony after the defendant “has committed another felony” the defendant “must be punished by imprisonment for life or for any term of not more than 99 years but not less than 15 years.” Appellant contends that the evidence as to one of the two previous felony convictions fails to show that defendant was represented by counsel and that such fact deprived it of its efficacy as a previous conviction under the Habitual Felony Offenders Act. He is correct as to the legal proposition stated, as shown by the authorities cited of Douglas v. State, Ala.Cr.App., 406 So.2d 1051, 1052 (1981), and Watson v. State, Ala.Cr.App., 392 So.2d 1274, cert. denied, 392 So.2d 1280 (1981). We must now con *887 sider whether he is correct as to his factual contention.
The evidence on the sentencing hearing as to the previous conviction challenged by appellant as sufficient to warrant his consideration in enhancement of punishment pursuant to the Habitual Felony Offenders Act consists of certified copies of two documents pertaining to appellant’s conviction of forgery in July 1973 in the Circuit Court of Palm Beach County, Florida. One is a copy, of the judgment of conviction and sentence to imprisonment for one year and placing defendant on probation, which is signed by the judge of the court, which shows that the judgment was rendered on the defendant’s plea of guilty and contains no reference to or information as to an attorney. The other document, also signed by the judge, is on a printed form with a blank for the name of defendant and other blanks therein and which, in the first paragraph thereof, states:
“You, LARRY CONNELL JAMES, [type-wri tten], being now before the Court, attended by your attorney, _, (or knowing and understanding your right to an attorney, privately retained or court-appointed and your having waived your right to be represented by an attorney) and your having been found GUILTY of, or your having PLEADED GUILTY to: FORGERY, as charged in Count One of the Information, [typewritten! now therefore I ADJUDGE you to be GUILTY of the offense (offenses) to which you (were found GUILTY) (PLEADED GUILTY).”
Appellant says:
“There is nothing to indicate that the appellant affirmatively waived his right to an attorney. The mere failure of putting in the attorney’s name could not be construed as affirmative action waiving his right to an attorney. There was no marking, underscoring, or initialing of the portion of the sentence that was enclosed by parentheses that could have been an affirmative action of waiving his right to an attorney.”
Disagreement therewith is expressed in ap-pellee’s brief by an argument that concludes as follows:
“The Appellee contends that the failure to identify who his counsel was does not render void such certified prior conviction. The concerned document states that the Appellant was ‘attended by your attorney.’ ”
We do not agree with the conclusion reached by appellee. We conclude that the evidence does not show that defendant was represented by counsel in the case in which he was convicted of forgery or that he knowingly and understanding^ waived his right to counsel. In our opinion, the evidence indicates that he did not have an attorney and does not show affirmatively that he waived his right to an attorney.
This cause should be remanded to the trial court with instructions that another sentencing hearing be conducted and that a proper and appropriate sentence be then pronounced. The trial court will make a return to this order of remandment with notice to the parties, and either party aggrieved thereby will have fourteen days thereafter within which to file a brief with this court and the opposing party will have seven days thereafter within which to file a reply brief.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REMANDED.
All Judges concur.