LEIGH M. CLARK, Retired Circuit Judge.
This appellant was found guilty by a jury on a trial on an indictment charging him with robbery in the first degree “in violation of 13A-8-41 of the Code of Alabama” in that he:
“... in the course of committing a theft of Thirty Pour Thousand Seven Hundred Sixty Nine and 16/100 Dollars, ... the property of Winn Dixie Stores, Inc., a corporation, used force against the person of Gary Peters, with the intent to overcome his physical resistance or physical power of resistance, or did threaten the use of force against the person of Gary Peters, with intent to compel acquiescence to the taking or escaping with the property, while the said Walter Samuel James, was armed with a deadly weapon, to-wit: a pistol_”
We now quote from a pertinent part of the testimony of the first witness for the State, Gary Peters:
“Q. How long have you worked for Winn-Dixie in Dothan?
“A. Since September.
“Q. Is that out there is Southview Shopping Center?
“A. Right.
“Q. Back in September, 1982, what was your position or title?
“A. My title, I was called third man, Junior Assistant Manager.
[[Image here]]
“Q. Let me ask you this, did Winn-Dix-ie, prior to 7:30 P.M. that night, have any type of procedure whereby you kept any type of marked money or United States currency with the serial numbers recorded in the safe at the store?
“A. Yes, we did.
“Q. Do you know what? Was it cash—
“A. Yes, I do.
“Q. Tell us what it was.
“A. One ten-dollar bill, two fives and a one.
“Q. Now, did you also have a list that you kept in the Montgomery Division and also of your serial numbers of the four bills?
[[Image here]]
“A. Yes.
“Q. On this occasion, on this date, February 27th, 1983, did you have four bills in the safe in the little office that were marked?
“A. They were in the office monitor.
[[Image here]]
“Q. Now, if I could, right around 7:30, Mr. Peters, where were you positioned, if you recall?
“A. At the courtesy counter right outside the office.
“Q. All right. Did you have an occasion, shortly thereafterwards to go inside the little office?
“A. Yes, I did.
“Q. Did you have any telephones out there at the Winn-Dixie in the office?
“A. We got one in the office and one on the office — one on the outside wall of the office.
“Q. Hangs on the wall outside the office, is that correct?
“A. Yes.
“Q. What was your occasion for going in the individual office?
“A. The office phone rang and I opened the door to go in.
“Q. When you opened the door, did you go in?
“A. Yes, I went completely in and pulled the door to behind me.
“Q. What happened next?
*810 “A. The next thing I knew I heard a sort of hissing sound from behind me.
“Q. Like a psst?
“A. Yes.
“Q. What did you see when you turned around?
“A. I turned around and saw a black man standing inside the doorway with the door pulled to behind him.
“Q. Standing completely up?
“A. I’m not positive.
[[Image here]]
“A. He was standing on the bottom step.
“Q. In what position?
“A. Sort of a crouched position.
“Q. Holding anything in his hand at that time?
“A. Yes, he was. A revolver.
[[Image here]]
“Q. What was it pointed at?
“A. At me.
“Q. Was anybody else in the office at this time?
“A. No, there wasn’t.
[[Image here]]
“Q. Where is your currency kept at this point?
“A. Kept in the safe.
“Q. What did the man who had the gun say to you after he made the noise and got your attention—
“A. He indicated to me to hang up the phone immediately and I did.
“Q. What did you do next? What did he say to you?
“A. He pointed the gun toward the safe.
“Q. Did he say anything?
“A. He mumbled and I opened it.
“Q. Were you afraid at that point?
“A. Slightly.
[[Image here]]
“Q. Let me ask you this, were there any bags inside the office at this time? Paper bags or money bags, cloth bags?
“A. There was one grocer sack.
[[Image here]]
“Q. What did he tell you to do with relation to that bag and the money in the safe, if anything?
“A. Told me to put the money in the bag.
[[Image here]]
“Q. What did you do with the bag while he had the gun on you?
“A. I set it down on the floor and some time during that [time] he slipped behind me and cut the phone cord.
“Q. Do you know what he cut it with?
“A. No, I don’t.
“Q. What did he do after he cut the cord?
“A. He told me to lay down on the floor face down and not get up because he had help.
“Q. Who did that money belong to?
“A. Winn-Dixie.
[[Image here]]
“Q. Did anybody come in the store at this point? Now, what I’m talking about, before he got the sack and left this little office?
“A. No one came in.”
According to the undisputed evidence in the case, some part of the sack of money that was stolen was afterwards recovered by law enforcement authorities, but at the time and place of such recovery Walter Samuel James was not present. The issues presented by appellant question the admissibility of the evidence of the money that was recovered in the State’s effort to show that this appellant was the robber who robbed him of the money but who Mr. Peters was unable to identify. For this reason, we think it appropriate for us to narrate the parts of the evidence that bear upon the question of the issues presented in brief of counsel for appellant, which we now proceed to do, by quoting from brief of counsel for appellant as follows:
“The State then called Mr. Jerry Walden to the stand.... The witness testified that on the date and time in question he saw two black men enter the store, one going to the right and the other to the left. He further stated that one of the men asked him for change at the reg *811 ister. He stated that after the change was made, he watched the black man look around to see if any more customers had entered the store. Mr. Walden stated the black man then left the register and began playing the Ms. Pacman machine. Mr. Walden stated that he went to the office and saw a black man inside with Mr. Peters. He continued and said that the office door opened and the black man came out carrying a crumpled grocery bag. (R. 43-45). The witness stated that he watched while the two black men left the store. He immediately went next door and called the police. (R. 46).
[[Image here]]
“The State then called Mr. Leatherwood, head of security at the Montgomery Winn-Dixie office, to the stand. Mr. Leatherwood discussed the use of bait money that was put in the store prior to opening on February 27, 1983. The State then introduced Exhibit 5, the original paper with the serial numbers on it. (R. 54) The money was compared with the numbers that were on the original paper and it was confirmed that they did correspond.
“The State then called Sgt. R.G. Russell of the Florida Highway Patrol to testify. Sgt. Russell testified that he had issued a ticket in Jackson County, Florida, to the defendant on the night of the robbery because the car that the defendant was driving had no tail lights. At this time the State introduced State’s Exhibit 8, the original traffic ticket issued by Officer Russell (R. 61). Officer Russell then identified the defendant through pictures introduced as Exhibits 2, 3 and 4. Sgt. Russell further testified that there was a license plate on the front of the car driven by the defendant on the night of the robbery which read ‘Amy’, and that the license plates on the rear of the vehicle were Florida plates. Sgt. Russell further testified that there was only one occupant of the vehicle and that he could not clearly identify the clothing worn by the occupant.
[[Image here]]
“The attorney for the State called Investigator Wayne Luke of the Tallahassee Police Department to the stand. Mr. Luke identified the vehicle driven by the defendant as belonging to Amy Lamb. The Defendant’s girlfriend [sic].
“The witness further testified that on February 28, 1983, at 9:15 p.m. he and Sam Bruce, an investigator, went to Amy Lamb’s apartment and took her to the County Sheriff’s Department. (R. 72) Investigator Luke testified that he gave Ms. Lamb the Miranda rights and the consent to search form. He said that he questioned her about the whereabouts of Walter James. (R. 92). The witness stated that Ms. Lamb signed the form. (Amy Lamb denied signing any papers until after the search.)
“Mr. Luke went on to testify that during the search a locked attache case was found in the master bedroom closet. Investigator Luke stated that he turned the attache over to an identification technician, Mr. Carroll Hurdle. (R. 75-78) Mr. Luke stated that the case was opened the next day while in possession of Investigator Charles Brooks.
“On cross-examination, Mr. Bullard [attorney for defendant-appellant] questioned the ownership of the attache case in the actual residence of the Defendant. (R. 79-82).
“Mr. Luke again testified that Amy Lamb, of her own free will, signed a waiver of search for her residence.
“Mr. Bullard filed a Motion for Mistrial and Motion to Suppress the Evidence and as grounds therefor stated that he had discovered new evidence that would have made some of the evidence that the jury had heard prejudicial toward the defendant. Further, the search of Amy Lamb was illegal and any evidence so found would have been inadmissible. (R. 100-102).
“Ms. Lamb testified that Investigator Luke first visited inside her home and then during the search found there marijuana. She further testified that Investigator Luke threatened to take her to jail if she did not give them information con *812 cerning Walter James. (R. 103) Ms. Lamb stated that Mr. Luke further threatened her with a jail sentence because of the marijuana found. (R. 103-104) Ms. Lamb further testified that Investigator Luke picked her up at her home and drove her to a public park, hollered at her and threatened her in that if she did not cooperate with him, he would turn her over to the proper authorities. Lamb testified she did not sign a consent form for the search the night the officers had invaded her home. (R. 85) “District Attorney Valeska cross-examined the witness, Ms. Lamb, on voir dire and Ms. Lamb stated under cross-examination that Mr. Valeska had hollered at the witness in order to induce her to testify. (R. 105-106). Ms. Lamb further testified on cross-examination that a black police officer in Tallahassee, Florida, had threatened to go to bed with her if she did not cooperate. (R. 106). The witness stated further that she did not go to the authorities because she was afraid. (R. 107). Ms. Lamb testified that the police officers were already inside of her house when she signed the consent forms to search her premises. She says that this was because the police officers had frightened her. (R. 112). “The witness, Ms. Lamb, testified further under cross-examination that the briefcase that she had identified on the previous day was not the briefcase that was found on her premises. (R. 115). “Mr. Bullard redirected Ms. Lamb on voir dire (R. 117) and Ms. Lamb testified that on the night after she testified on the first day of the trial that she was locked up and the telephone in the motel room where she was held under guard was disconnected so that she could not reach anyone. She further stated that she was not allowed to make any telephone calls. (R. 117) Ms. Lamb further testified while Mr. Bullard was interviewing her, under court order, that the police officers prevented or attempted to prevent him from talking with the witness, Ms. Lamb. Ms. Lamb testified that she had a matron sleeping in the room with her and two guards on the outside of her room (R. 117).
“In opposition to the above motions, Mr. Valeska called Investigator Wayne Luke. Officer Luke testified that he had known Amy Lamb for probably two years and that he had known her husband who is now deceased. (R. 121). He further testified that he had a good working relationship with Amy and had never had any problems with her before. Officer Luke further testified that he nor no one in his presence threatened Ms. Lamb. (R. 122). Officer Luke testified that Ms. Lamb had told him that there was a briefcase in her residence that contained money. (R. 123). Investigator Luke denied ever sending a black investigator to the home of Amy Lamb. (R. 125). Officer Luke also denied ever screaming or hollering at the witness, Ms. Lamb. (R. 126). Officer Luke testified that he did find marijuana in the apartment of Ms. Lamb and did not charge her for possession of marijuana. (R. 127-128). Officer Luke testified that there was a black investigator with the Tallahassee Police Department and that he could have visited Ms. Lamb.
“The Court denied the Motions filed by Mr. Bullard. (R. 132).
“Ms. Lamb was cross-examined by Mr. Bullard and she stated that her reason for testifying against James was because there were so many threats towards her and she was afraid that she would be prosecuted because of the marijuana they found that belonged to her. She also testified that the briefcase was not James’ because it was not the same color nor was it in the same condition as the one belonging to James. (R. 135-143). Ms. Lamb said that the gun the investigators found was hers, not James’, and that the investigators took the .22 caliber pistol back with them to the police station. (R. 154-155).
“Investigator Brooks was called back to the stand and he testified that he went along with Bruce and Luke to search Lamb’s apartment and that it was he *813 that took the briefcase to the Criminal Court Building. He also testified that such a warrant was obtained one day later, March 1, 1983. Brooks testified that he opened the case and discovered $3,200.00 (R. 162-166). This amount was less than 10% of that stolen from the Winn-Dixie Store.
“At this point the State rested its case. (R. 171).
“Mr. Bullard, out of the presence of the jury, moved the Court to exclude the State’s evidence and for a verdict of acquittal. These Motions were denied. “After a brief recess, the defendant rested. (R. 173).
“The jury then deliberated and the defendant, Walter Samuel James, was found guilty of First Degree Robbery.”
By the first issue presented in brief of counsel for appellant, he says the trial court was in error in permitting the introduction into evidence of an attache case purporting to be that of defendant containing some of the currency alleged in the indictment in the instant case to have been stolen by defendant that law enforcement authorities found in the apartment of Amy Lamb where the defendant at the time was “not a co-habitant of said premises.” The argument is made by appellant’s counsel that “at no time during the testimony in this trial did the State conclusively prove that the defendant had joint control, was a joint occupant, or had common authority over the premises of Amy Lamb.” Nevertheless, there was substantial evidence that the status of defendant was at times that of a “joint occupant” with “common authority over the premises” in which the attache case and currency were found, as exemplied by the following testimony of Amy Lamb on the trial of the case less than a year from the date of the alleged robbery:
“Q. Do you know Walter Samuel James?
“A. Yes, sir.
“Q. How long have you known him, Ms. Lamb.
“A. About a year.
“Q. Okay. Ms. Lamb, I don’t mean to pry into your relationship, did ya’ll have a boyfriend-girlfriend relationship on or before then?
“A. Did we have what?
“Q. A boyfriend-girlfriend relationship?
“A. Yes.
“Q. Do you own a green Thunderbird?
“A. Yes.
“Q. I show you State’s Exhibit 2 and let you look at it right there, is that your Thunderbird, with Amy on the front plate?
“A. Yes.
“Q. Ms. Lamb, on February 27th, 1983, did Walter Samuel James borrow your car?
“A. Yes, but, I don’t know where he was going.
“Q. I didn’t ask you that, ma’am, that’s fine. Did you see him later that night at that Comer Street apartment?
“A. What night?
“Q. February 27, 1983, February 28th after midnight?
“A. I saw him that Sunday night.
“Q. Yes, ma’am, that’s the 27th.
[[Image here]]
“Q. Ms. Lamb, my question is, please, ma’am, did you see him sometime after midnight back at your apartment? Did he come back home?
“A. Yes.
“Q. When he came back home, where did he go?
“A. He went to use the bathroom.
“Q. When he went in the bathroom, ma’am, what did you hear he was doing in the bathroom?
“A. I heard — it sounded like money counting. I don’t know — know what happened.
[[Image here]]
“Q. Did you see what he brought inside the apartment when he came in?
"A. No.
“Q. Let me show you — let me show you State’s Exhibit 9, Ms. Lamb, whose brief *814 case is that, if you know? Take your time, ma’am, and tell us whose it is?
“A. Walter takes it to school with him when he goes to school.
[[Image here]]
“Q. Did you see the brief case on February 28, 1983, when he came in?
“A. No.
“Q. Did he put it in the closet?
“A. I don’t know what he did with it. “Q. Who found it?
“A. Wayne Luke did.
“Q. Of the Robbery Task Force?
“A. Yes.
“Q. You told them it was there?
“A. No, He asked me what it was in it and he got me so scared and shook — I told him I didn’t know what was in the suitcase.
[[Image here]]
“Q. Let me ask you ma’am, they found it in your apartment, didn’t they?
“A. Yes, they found it.
“Q. In your bedroom?
“A. In the closet.
“Q. Okay. He asked you that night if Walter Samuel James came and gave you three hundred dollars?
“A. Yes, but I didn’t—
“Q. What did he tell you to do with the money?
“A. Pay the rent.
[[Image here]]
“Q. I understand you did. The next question I want to ask you, ma’am, what did you do with that money?
“A. I paid my rent.”
We also note that at one time during the voir dire interrogation of Amy Lamb, she testified as follows:
“Q. All right. Who besides Mr. Bullard have you told that to?
“A. I have told my old man right there.
“Q. Okay. Your old man? Walter Samuel James?
“A. That’s right.”
What we have quoted above from the testimony of Amy Lamb is sufficient, we think, for us to determine adversely to appellant the first issue presented in the brief of his counsel by which it is stated that defendant was “not a co-habitant” of the premises occupied by Amy Lamb where the attache case was found.
The next issue presented by appellant is thus stated in brief of counsel for appellant:
“The second issue raised by appellant in this case is where a third party consents to a warrantless search of premises where defendant’s personal effects are merely being stored must the prosecution show that the consent was given freely and intelligently to [sic] that third party as is required in a case where defendant must give consent freely and intelligently?”
From what we have stated in our consideration of the first issue presented in appellant’s brief, the statement in the quoted Issue II that “Defendant’s personal effects are merely being stored” is not supported by the evidence in the case. To the contrary, the evidence shows that defendant’s personal effects, including his attache case and the money therein, were not “merely being stored” but were placed in the particular dwelling because it was the dwelling of defendant in common with that of Amy Lamb. Appellant’s Issue II is not well taken.
The final issue presented in brief of counsel for appellant is as follows:
“The third issue that the appellant wishes to raise in this matter is does the government have a right to search a locked briefcase in which a third party gave consent to search premises where briefcase was found?”
In purported support of the defendant’s last issue, his attorney cited United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and subsequent authorities to the effect that there “being no exigency, it was unreasonable for the government to conduct a search of footlockers without the safeguards that a judicial warrant provides.” The facts in the instant case are distinguishable from those in United States v. Chadwick and other cases *815 cited in that, according to the testimony of Officer Charles Brooks of the Tallahassee, Florida, Police Department, he took into his possession the locked briefcase otherwise referred to as an attache case, and went with it to the Sheriffs Department in Leon County, Florida, soon after it was taken from the apartment occupied by Amy Laimb and soon thereafter retrieved the same attache case while it was still locked. He testified further as follows:
“Q. All right. Now when you retrieved it out, prior to doing that, had you gone to a Judge in the Criminal Court of Tallahassee and obtained a search warrant to open this case up?
“A. Myself and Lt. Gary Locke [sic] of the Dothan Police Department went before the County Judge John Cruzo in Leon County, Florida, with an affidavit for search warrant and it was granted to us.
“Q. Okay. Just for the record, Gary Kinney or Lt. Harold Locke?
“A. Lt. Harold Locke, excuse me.
“Q. All right. Now, with the search warrant — when you went to Judge to obtain it, what information did you give him in the affidavit to tell him that you needed to open this up or you believed there was contraband in this suitcase?
“A. I gave him information based on what I had received from Amy Lamb.
“Q. Okay. What was that?
“MR. BULLARD: Objection, Judge, that’s — .
“THE COURT: I sustain.
“Q. Did she give you all the information? Is that what you based the affidavit on to the Judge?
“A. She did.
“Q. All right. Did you get any other information to the Dothan Police Department in reference to the alleged robbery?
“A. I did.
“Q. And did you get any information from Investigator Wayne Luke?
“A. I did.
“Q. How recent — what I’m getting to is how many days, weeks or months, was that information that you got from Amy Lamb? How current was it?
“A. It was current.
“Q. Can you give me a day, one day, half a day, two days?
“A. From the time I got the information the search warrant?
“Q. What you got from Amy Lamb?
“A. I got the information from Amy Lamb on February 28, 1983.
“Q. When did you get the search warrant?
“A. March 1st — next morning. March 1st, 1983.
“Q. Okay. One day later, then?
“A. Yes, sir.
“Q. All right.
“A. Basically about ten hours.
“Q. Did you swear in the affidavit what was in there was contained was [sic] true and correct?
“A. I did.
“Q. And you gave that to the Judge?
“A. I did.
“Q. And he signed the search warrant, is that correct?
“A. Yes, sir, he did.
[[Image here]]
“Q. Let me ask you this, you had the affidavit and the search warrant when you opened it, is that correct?
“A. Yes, it is.
[[Image here]]
“A. Well, I had to take a screwdriver to force these locks because we didn’t have a key.
“Q. And when you opened it up, was there anything inside it?
“A. Yes, sir, there’s money.
“Q. All right. I’ve opened it up for the record and there appears to be three stacks of United States currency; what did you find when you opened it?
“A. I found basically as it is intact here. When we started counting the money.
“Q. All right. Did it have any type of items around the money?
“A. Had rubber bands around it.
“Q. Okay. Did you check the serial numbers on the money?
*816 “A. Idid.
“Q. Did you do that through Lt. Harold Locke?
“A. Idid.
“Q. And did you get a comparison from a list Sgt. Locke had — Lt. Locke?
“A. Sergeant Kinney had it. He was present.
“Q. All right. The serial number is what I am asking.
“A. Yes, sir.
“Q. State’s Exhibit 5, one dollar bill, do you recognize that one?
“A. Yes, sir, it has my initials and the date that it was found in the briefcase.
“Q. Okay. And what date was that?
“A. 3/1/83.
[[Image here]]
“Q. Okay. Now, after you opened it, what did you do with the money in the briefcase?
“A. We sealed it back up and Sgt. Kinney took possession of it and brought it to Dothan.
“Q. Okay. I offer State’s Exhibit 6, the money, the currency at this time.”
We conclude from what we have stated above that a search warrant was issued by judicial authority, which distinguishes the instant case from that which was held in the authorities cited by appellant. The final issue presented by appellant is decided adversely to appellant.
The writer of this opinion believes that perhaps he should note that a man by the same name as this appellant, Walter Samuel James, was one of two participants in a robbery occurring at a store of Winn-Dixie, Inc., a corporation, at Troy, Alabama, in Pike County, (a county adjoining Houston County,) the county in which the robbery in the instant case occurred, which other case is that of James v. State, [Larry Connell James, alias], 461 So.2d 878 (Ala.Cr.App.1984).
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of Judicial Article, § 6.10. (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.