Jere CHATOM, Petitioner–Appellant,

v.

J.D. WHITE, WARDEN,
Respondent–Appellee.

No. 87–7776.

United States Court of Appeals,
Eleventh Circuit.

Oct. 27, 1988.

Wanda J. Cochran, Silver, Voit & Inge, Mobile, Ala., for petitioner-appellant.

Don Siegelman, Atty. Gen., P. David Bjurberg, Asst. Atty. Gen., Montgomery, Ala., for respondent-appellee.

Before RONEY, Chief Judge, JOHNSON, Circuit Judge, TIDWELL *, District Judge.

G. ERNEST TIDWELL, District Judge.

In this case, Petitioner, Jere Chatom appeals from the federal district court's order denying his petition for *habeas corpus* relief. Following a jury trial, the Circuit Court for Mobile County, Alabama, convicted Chatom of two counts of first degree murder for the shooting deaths of two sheriff's deputies. The Court of Criminal Appeals of Alabama initially overturned the trial court conviction, however, the Alabama Supreme Court, in a 5–4 decision, reversed the Court of Criminal Appeal's decision and remanded the case. On remand, the Court of Criminal Appeals, in a per curiam opinion, affirmed Chatom's conviction. In his federal *habeas corpus* petition to the district court, Chatom raised various challenges to his conviction in state court. The district court denied relief as to all of petitioner's claims. We reverse the district court's denial of a writ of *habeas corpus* based upon our determination that Chatom did not receive effective assistance of counsel at trial as guaranteed by the Sixth Amendment to the Constitution.

## BACKGROUND

Chatom's murder convictions resulted from the shooting deaths of two sheriff's deputies in Mobile County, Alabama on November 17, 1975. The circumstances of the deputies' deaths are adequately described in *Chatom v. State*, 348 So.2d 828 (Ala. Crim.App.1976), *rev'd* 348 So.2d 838 (Ala. 1977), *on remand* 348 So.2d 843 (Ala.Crim. App.1977).

The state's entire case against Chatom consisted of circumstantial evidence which sought to prove that either Chatom fired the gun which killed the deputies or that Chatom aided and abetted his accomplice, Michael Wilson, who shot the deputies prior to his own death on the day in question. Under Alabama law, either the "trigger-man theory" or the "accomplice theory" could, independently, support a conviction for first degree murder. *See* Ala.Code, Title 14, §§ 314 and 14 (1940) (presently codified at Ala.Code § 13A–6–25 (1982) and Ala.Code § 13A–2–23 (1982) respectively.)

---

* Honorable G. Ernest Tidwell, U.S. District Judge for the Northern District of Georgia, sitting by designation.

The state's evidence against Chatom at his trial included the results of an "atomic absorption test" performed on the body of Chatom's accomplice, Wilson. *See Chatom*, 348 So.2d at 831. The atomic absorption test allegedly indicates whether a person recently fired a gun. The state, by use of the negative results of the test performed on Wilson's body, sought to prove that Wilson did not fire a gun prior to his death on November 17, 1975; the inference rising from such evidence being that if Wilson did not fire a gun on that day someone else, presumably Chatom, fired the shots which killed the deputies.

The state introduced the test results at the conclusion of its case-in-chief through the testimony of Dr. John McDuffie. Dr. McDuffie, a criminal investigator for the Alabama Department of Toxicology, administered the atomic absorption test to swabs taken from Wilson's body, apparently after the body had been dragged from the place of the incident and after the body had been embalmed. With Dr. McDuffie on the stand, the prosecutor introduced the results of the test in the following manner:

Q. Doctor, who do you work for?

A. The Alabama Department of Toxicology in Criminal Investigation.

Q. Where are you located, Doctor?

A. At Auburn, Alabama.

Q. How long have you been with the department?

A. Approximately three years.

Q. What kind of degrees do you have, please, sir?

A. I have a B.S. in chemistry from Emory University. I have a Ph.D. from Auburn University.

Q. Over the past three years have you had an opportunity to work a machine or an examination called atomic absorption?

A. Yes, I have.

Q. Explain to the jury what that is please, sir.

A. This is a machine that analyzes for certain elements by atomizing the elements due to heat. In other words, what it does is simply vaporize the elements into a light path. Once the elements are in the light path they are picked up by a light path and the machine can analyze as to the amount present or the particular elements present based on the particular light beam that you put through it.

Q. Does this particular test also or will it, along with a number of other things, determine primer residues?

A. Yes, sir.

.      .      .      .      .

Q. Do you have an opinion as to whether or not there was any primer residues on these swabs?

A. Yes, sir.

Q. What is that opinion?

A. My tests failed to reveal the presence of certain elements consistent with primer residues.

Q. Is that consistent with a person not having fired a recently fired weapon?

A. Yes, sir.

*Chatom*, 348 So.2d at 831–32.

The state proffered this predicate and expert opinion without any objection by Chatom's counsel. The failure to offer any objection on the part of Chatom's counsel occurred despite the fact that the prosecution failed to inform defense counsel of the existence of such test results prior to the commencement of trial as required by an order of the court mandating the production of "any and all reports, examinations, tests, ballistics, or other material completed by the Department of Toxicology." *See* Trial Transcript at 7 (Order, Motion to Produce—Granted as to Counts 1, 2, 4, 5, 6 and 7, Denied as to Count 3).

After failing to object to the introduction of the credentials of the expert witness and the opinion proffered by Dr. McDuffie, Chatom's counsel cross-examined the expert as follows:

Q. Is this test infallible?

A. No, sir.

Q. Have you ever run such a test on Milo Sennett?

A. I am not certain as to whether I have or not, sir.

Q. You know who I'm talking about Mr. Milo Sennett?

A. Yes, sir.

Q. What is the accuracy percentage of this machine, of this test, in the last survey that you've made?

A. I'm not certain, sir. On tests that I have run myself where I know a gun has been fired, is that what you're asking. I would guess, sir, it's in the neighborhood of 75 to 80 percent of the time.

Q. That is all? Seventy-five to eighty percent of the time?

A. Yes, sir.

*Chatom,* 348 So.2d at 832.

Following the cross-examination of Dr. McDuffie, Chatom's counsel made a motion to exclude the evidence introduced through McDuffie's testimony; the trial court reserved judgment on the motion. In response to McDuffie's testimony, Chatom's counsel recalled one of the state's witnesses, Mr. Milo Sennett, a state toxicologist, eliciting the following:

Q. ... have you ever heard of the atomic absorption test for primer residue?

A. Yes, I have.

Q. Are you familiar with the test?

A. I am. I know a little bit about it but I wouldn't say that I know a lot about it.

Q. In connection with your work have you ever undergone—in connection with your work in the Department of Toxicology have you ever undergone that test on yourself?

A. Yes, I have.

Q. And have you ever undergone that test with a 38 caliber pistol such as that?

A. I have fired several 38 caliber pistols.

Q. All right, and what—did you take a swab of some sort and ...

A. Some swabs were taken of my hands.

Q. All right, and were those in turn examined under the atomic absorption primer residue test?

A. They were.

Q. Did it come back affirmative or negative?

A. On one test that I know about the results came back there was not a significant level of residues on my hand.

Q. In other words, it was negative?

A. It was inconclusive.

Q. Which means did not tell whether you fired a gun or not?

A. That's correct.

*Id.*

At the conclusion of Sennett's testimony the court addressed Chatom's motion to exclude the results of the atomic absorption test through the following colloquy:

THE COURT: The only thing that has not been ruled upon is the question of the admissibility of the test performed by Dr. McDuffie. If you have any cases you want submit [sic] to me at this time you can go ahead.

\*    \*    \*    \*    \*    \*

MR. VALESKA [Assistant District Attorney]: Your Honor, I can cite to this Court, 50 A.L.R.3d 117, the neutron activation test that was admitted and in that the Court of Appeals for the Second Circuit in New York held that, "The Court noted that a strong showing of unreliability must be made in the trial court," and we submit that has not been made. We cite—there are numerous cases in here, Judge. This is another new type test they use to find bombs in mail ...

MR. ALONZO [Chatom's counsel]: Judge, this has nothing to do with putting something on a man's hand. This neutron activation, I don't know what that is.

MR. VALESKA: Well, you didn't know what the other one was either.

MR. ALONZO: That's right, and you haven't told us ...

(Mr. Alonzo and Mr. Valeska speak at once.)

MR. VALESKA: We submit it to the Court for the Court's perusal if you wish. That's our authority.

(Cases submitted to the Court.)

THE COURT: Motion is denied. Gentlemen, you have about 30 minutes.

*Id.* at 832–33.

Following the evidence phase of the trial, the jury returned general verdicts of guilty to two counts of murder in the first degree. The trial judge sentenced Chatom to two life terms of imprisonment.

The Alabama Court of Criminal Appeals subsequently overturned Chatom's conviction, remanding the case for a new trial. The court based its decision upon its finding that the trial court admitted the results of the atomic absorption test without a proper predicate. *Chatom,* 348 So.2d at 834. The court specifically found:

no testimony concerning the exact time the swabs were taken from Wilson's body. In addition there was no testimony indicating the lapse of time between the shooting or the taking of the swabs, and the time when Dr. McDuffie tested the swabs for gun residue. Needless to say, we are totally without knowledge as to what effect a delay would have on the accuracy of the test. In addition there is no testimony that the 75% to 85% figure would apply to a shotgun as opposed to a pistol where the muzzle is in close proximity to the hand. Thus, the accuracy of the test was not sufficiently established by the State.

*Id.* at 833. By so finding, the Alabama state court held that the trial court wrongly denied Chatom's motion to exclude the evidence of the atomic absorption test. *Id.* at 834.

On rehearing, the Court of Criminal Appeals, in a *per curiam* opinion, explicitly reiterated "[f]irst, the conviction of appellant was not reversed due to insufficiency of the evidence.... [and] [s]econdly, reversal was due to the introduction into evidence of the atomic absorption test without a proper predicate." *Id.* at 837.

Upon the state's petition for certiorari, the Alabama Supreme Court, in a 5–4 decision, found the atomic absorption test not to be *per se* inadmissible. *Chatom,* 348 So.2d at 842. Four Justices held that the state's predicate for the admission of the test, adduced without objection from Chatom's counsel, sufficiently established that the trial court did not abuse its discretion in admitting the evidence. *Id.* Justice Beatty, concurring specially, found that because Chatom's counsel made no objection to the introduction of the test results, he waived any objection to their admissibility even though the predicate, if challenged, may have been found to be deficient. *Id.* (Beatty, J., concurring specially). In light of the plurality of four justices and the special concurrence of Justice Beatty, the court reversed the decision of the Court of Criminal Appeals overturning Chatom's conviction and remanded the case to the Court of Criminal Appeals.

On remand, the Court of Criminal Appeals, in a *per curiam* opinion, concluded that "[s]ince [the atomic absorption test] is admissible by default, a jury question is presented." *Chatom,* 348 So.2d at 844. Finding the evidence of the atomic absorption test admissible based upon a procedural default, the court determined that a jury question existed and found that the jury had before it sufficient evidence and reasonable inferences which could be derived therefrom to support their verdict of guilty. *Id.* By so finding, the Court of Criminal Appeals affirmed Chatom's conviction. *Id.*

Following the exhaustion of his direct appeal, Chatom filed a *pro se* petition for a writ of error *coram nobis* before the state trial court in April 1980. Chatom's original petition asserted ineffective assistance of counsel as grounds for relief. Following appointment of counsel to assist with the petition, the movant amended the petition on two occasions to conform with procedural requirements. After an evidentiary hearing before the original trial judge, at which Chatom's trial counsel and other witnesses testified, the original trial court judge denied Chatom's petition for a writ of error *coram nobis.*

On December 8, 1981, Chatom filed a *pro se* petition for a writ of *habeas corpus* in

the United States District Court for the Southern District of Alabama. Subsequent to the appointment of counsel, the United States Magistrate for the Southern District of Alabama, recommended that the petition be denied based upon the state court record. Substitute counsel for Chatom filed objections to the recommendation and later sought and was granted leave to amend the original petition. The Magistrate recommended that the amended petition be denied based upon his previous recommendations and upon a finding that two of the petition's amended claims were procedurally barred under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 2d 594 (1977).

On August 31, 1987, United States District Judge for the Southern District of Alabama entered an order denying the petitioner *habeas corpus* relief. This appeal from the order of the district court followed.

## DISCUSSION

Petitioner asserts various claims of error by the district court in denying petitioner's petition for a writ of *habeas corpus*. Finding petitioner's claim of ineffective assistance of counsel at trial to be meritorious, we do not deem it necessary to address any other claims of error presented by petitioner.

Petitioner asserts that by virtue of his trial counsel's handling of the scientific evidence at trial, more specifically the atomic absorption test, petitioner did not receive effective assistance of counsel guaranteed by the Sixth Amendment. Addressing petitioner's claim of ineffective assistance, the district court held that upon viewing the record, the actions or omissions Chatom's trial counsel did not rise to the level of actual deficiency required under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We disagree.

The Sixth Amendment guarantees those criminally accused to have "Assistance of Counsel" for their defense. U.S. Const. amend. VI. The purpose of this Sixth Amendment right to counsel is to protect the fundamental right to a fair trial. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This protection lies in the skill and knowledge counsel affords a defendant which provides a criminal defendant "ample opportunity to meet the case of the prosecution." *Strickland*, 466 U.S. at 685, 104 S.Ct. at 2063, 80 L.Ed.2d at 691, *citing Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 276, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942).

Acknowledging the extreme importance of this right, the United States Supreme Court has held:

> That a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Strickland*, 466 U.S. at 685, 104 S.Ct. at 2063, 80 L.Ed.2d at 692. Thus, the Court has recognized that the "the right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763, 773 (1970).

When addressing claims of ineffective assistance of counsel, the Supreme Court has instructed that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93. The specific test enunciated by the Court for analyzing ineffective assistance claims is:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversarial process that renders the result unreliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

### A. DEFICIENT PERFORMANCE

In applying the first prong of the *Strickland* test, the standard by which attorney performance is to be judged is that of "reasonably effective assistance." *Id. citing Trapnell v. United States,* 725 F.2d 149, 151–52 (2nd Cir.1983). Counsel's representation must be shown to fall below an objective standard of reasonableness. *Id.* 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed. 2d at 693. In reviewing the performance of an attorney in connection with an actual ineffectiveness claim, the court must look at the reasonableness of the attorney's action "in light of all the circumstances." *Id.* at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. When conducting such a review, the court should "indulge a strong presumption that the counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95. While the *Strickland* presumption is demanding, it is by no means insurmountable. *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 323 (1986).

*Strickland's* "in light of all circumstances" review does not preclude a finding of ineffective assistance where the alleged deficient actions or omission centers upon a single incident, if that error is sufficiently egregious and prejudicial. *United States v. Cronic,* 466 U.S. 648, 657 n. 20, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984). *See also Strickland,* 466 U.S. at 693–96, 104 S.Ct. at 2067–69, 80 L.Ed.2d at 674; *Birt v. Montgomery,* 725 F.2d 587, 597–98 (11th Cir.1984) (*en banc*) (pre-*Strickland*) ("When a single error is alleged, the counsel's failure must be so substantial as to 'stamp his overall performance with a mark of ineffectiveness.'"); *Nero v. Blackburn,* 597 F.2d 991, 994 (5th Cir.1979) (pre-*Strickland*) ("Sometimes a single error is so substantial that it alone causes the attorney's assistance to fall below the sixth amendment standard.") While the instance in which a single error will rise to the level of Sixth Amendment ineffectiveness is clearly the exception and not the rule, this case is one of those exceptions.

The state's case against Chatom consisted entirely of circumstantial evidence, no eyewitness could place Chatom as the individual who shot the officers nor could anyone even place Chatom in the vicinity of the area of the swamp where the shooting occurred. *See generally Chatom,* 348 So.2d 828 (Ala.Crim.App.1976), *rev'd* 348 So.2d 838 (Ala.1977), *on remand* 348 So.2d 843 (Ala.Crim.App.1977). Thus, the introduction of the atomic absorption test constituted a pivotal point in the trial in that it had the potential to reasonably establish in the jurors minds the fact that Wilson did not fire a gun and reasonably raise the inference that Chatom did. The Alabama Court of Criminal Appeals recognized the importance of the test results at trial when it stated:

> The most damaging evidence against the appellant [at trial] consisted of the results of an 'atomic absorption test.' The atomic absorption test allegedly will show whether a person has recently fired a gun. The State, by use of the atomic absorption test sought to show that Wilson had not fired a gun on November 17, 1975. If Wilson did not fire a gun on the day in question, then there would be a

strong inference that someone else, possibly the appellant, shot [the deputies]. *Chatom*, 348 So.2d at 831 (emphasis added). While a court reviewing counsel's conduct in an ineffectiveness claim is not to judge the actions hindsight, *see Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694, it is clear that at the time the evidence was being introduced it would be prejudicial to Chatom's case. Chatom's trial counsel failed, however, to make any contemporaneous objection to either the qualifications of the expert, the conditions under which the administration of the test occurred or the reliability of the test in general. *See* testimony of Dr. McDuffie, *supra*.

One reason proffered for the failure to contemporaneously object to the testimony of Dr. McDuffie was that the prosecution failed to inform defense counsel of the test or its results prior to the point at which Dr. McDuffie took the witness stand, thus surprising counsel for the defense. While surprise may have in fact occurred, this failure by the prosecution to inform defense counsel of the test should have made Chatom's counsel even more sensitive to attempting to exclude the testimony; an earlier order of the court requiring the prosecution to turn over to the defense copies of any tests performed by the Alabama Department of Toxicology was binding at the time the undisclosed test result were offered.

In addition to the potential objection based upon the failure to disclose the test results, Chatom's counsel had other credible, if not sufficient, grounds for objecting to the predicate and expert opinion offered by Dr. McDuffie. As the Alabama Court of Criminal Appeals points out, the conditions under which the test's administration occurred are questionable at best. *See Chatom*, 348 So.2d at 833, *supra*. While we make no determination as to the ultimate admissibility of the atomic absorption test in this or any other instance, we find that counsel's failure to object under the circumstances present in this case fell below standards of reasonable performance causing the adversarial testing contemplated by the Sixth Amendment to falter concerning this critical issue.

Furthermore, we agree with the finding of the Magistrate that the record in this case does not support the conclusion that the failure to object on the part of Chatom's counsel constituted a tactical decision beyond review under *Strickland*. The particular conduct at issue in this case cannot be characterized as a tactical decision within the "wide range of reasonable professional assistance" presumed by *Strickland*. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

## B. PREJUDICIAL EFFECT OF DEFICIENT PERFORMANCE

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 696. *Strickland* holds that the proper test for establishing prejudice resulting from counsel error is that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Thus, in the context of a criminal trial the standard is whether a jury, absent the errors, would have had a reasonable doubt concerning the guilt of the accused. *Strickland* establishes:

In making [a prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the ... jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidence picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.* at 695–96, 104 S.Ct. at 2069, 80 L.Ed.2d at 698–99. The state's entire case against Chatom consisted of circumstantial evidence. Evidence of the atomic absorption test could raise or may have supported a multitude of inferences damaging to Chatom. *See Chatom,* 348 So.2d at 830–31. Due to the general verdicts rendered by the jury which may have convicted Chatom on one of two different theories of liability, this court cannot say that evidence of the atomic absorption test did not have a prejudicial affect upon the jury's verdict. The protracted appellate history of this case indicates that the question of Chatom's guilt beyond a reasonable doubt is a close one. *See generally Chatom,* 348 So.2d 828 (Ala.Crim.App.1976), *rev'd* 348 So.2d 838 (Ala.1977), *on remand* 348 So.2d 843 (Ala. Crim.App.1977). While a timely objection by Chatom's counsel may have not excluded the evidence of the atomic absorption test, the lack of any objection clearly prejudiced Chatom since the adversarial testing contemplated by the Sixth Amendment did not occur. Additionally, the failure of Chatom's trial counsel to object later foreclosed Chatom from raising the issue of improper admission of the test on appeal due to the Alabama Supreme Court's determination that the issue was procedurally defaulted by counsel's failure to contemporaneously object.

Given the close question of Chatom's guilt beyond a reasonable doubt under one or both of the prosecution's theories and the form of the verdicts which do not indicate the theory upon which the jury based its verdict, we find that absent counsel's errors concerning the atomic absorption test there is a reasonable probability that the result of the proceeding may have been different.

## CONCLUSION

For the foregoing reasons we conclude that the petitioner has overcome the strong presumption of attorney competence and has shown that counsel's performance in regard to the atomic absorption test fell below the objective standard of reasonableness and that such errors caused the petitioner prejudice. We conclude that the district court's finding to the contrary is clearly erroneous, and that any decision to the contrary would be manifest error and would not be supported by the record. Accordingly, the decision of the district court is reversed and the case is remanded to the district court with instructions to issue the writ of *habeas corpus* conditioned on the state's right to retry the petitioner within a reasonable time.

REVERSED AND REMANDED.