**Mark HERMAN, Petitioner,**

v.

**Robert BUTTERWORTH, Respondent.**

**No. 88–8036–CIV.**

United States District Court,
S.D. Florida.

June 5, 1989.

Joseph Mincberg, Lubin and Mincberg, P.A., West Palm Beach, Fla., for petitioner.

Gay Broome, Asst. State Atty. and Sp. Asst. Atty. Gen., Joy Shearer, Asst. Atty. Gen., West Palm Beach, Fla., for respondent.

ROETTGER, District Judge.

Petitioner, MARK HERMAN, petitions to set aside his 1978 first-degree murder conviction. Herman, Petitioner hereafter, received a life sentence with a 25 year minimum; Petitioner is also serving sen-

tences totalling 25 years for various separate crimes of Possession of Concealed Weapon by a Convicted Felon; Possession of Stolen Property; Possession of Drug Paraphernalia; Violation of a Drug Law; and Extortion.

Petitioner filed a plenary appeal to the Court of Appeal and then sought certiorari in the Supreme Court of Florida; in both courts his conviction was affirmed. Various post-conviction remedies have also been filed and appealed in the Florida State courts so that a total of seventeen (17) Florida state judges have considered Herman's various appeals.[1] Not one has found any merit in his contentions.

This case comes before this Court on a Petition for Habeas Corpus, claiming an unconstitutional flaw in his trial. The U.S. Magistrate considered the matter and issued a Report and Recommendation supporting Herman's petition. This court now considers the Petition of Herman on its merits.

The court adopts the Statement of Facts, as stipulated by the parties and representing the factual findings of the State courts, from the Report and Recommendation prepared by the Magistrate. *See, Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981).

## THE FACTS OF THE CASE

In 1976 the victim, Richard Kreusler, his spouse and several of their children lived at 272 Via Marilla in the Town of Palm Beach, Florida; their next-door neighbors were a family by the name of Glocker. On the day of the homicide, January 16, 1976, the victim had participated in a fishing tournament. Upon returning home in the evening, he and his wife went to a friend's home to attend a reception for Florida Governor Askew; they left the reception around 9:15 P.M. and after arriving home around 9:45 P.M. Mr. and Mrs. Kreusler donned their pajamas, and went into the den of their home to watch television.

Shortly thereafter the doorbell rang, and Mr. Kreusler got up to answer the door. Mrs. Kreusler testified she heard a shot, and the next thing she knew her husband was exclaiming, "I['ve] been shot". Mrs. Kreusler immediately ran to her husband, put her arms around him and took him to the kitchen, where she called the telephone operator to get medical assistance for her husband. Mr. Kreusler told her that he had not seen anyone.

Mr. Kreusler died from the gunshot wounds on January 29, 1976, without having ever made a statement about who had shot him.

The police recovered two discharged 12 gauge "double-aught" buckshot shotgun shell casings at the murder scene. Three shotgun wads were recovered, which along with microscopic marks on the recovered shell casings, indicated that the murder weapon was a pump-style 12 gauge shotgun.

In August of 1976, based upon the sworn statement of one Ronnie Gates, a fugitive facing federal and state charges, Petitioner became a suspect in the Kreusler murder. The police obtained a search warrant to search a Tempe, Arizona storage warehouse containing Petitioner's goods. Pursuant to the search warrant, a 12 gauge pump shotgun was seized, together with various shotgun rounds. None of the shotgun shells contained double-aught buckshot. Subsequent ballistics tests on the seized weapon were, not surprisingly, found to be inconclusive. The 12 gauge pump shotgun was admitted into evidence at Petitioner's trial.

In November of 1976, Petitioner was convicted of unrelated crimes in a state criminal court trial. While awaiting sentencing, Petitioner was incarcerated in the Palm Beach County jail from November until the following January of 1977.

The critical testimony at trial, and the focus of this habeas corpus petition was the testimony of one Dexter Coffin, III, a repeat offender and self-styled jailhouse

---

**1.** Although the total number of Florida judges who've heard *Herman* appeals or motions is 24, the total number of *different* judges hearing *Herman* appeals—17 (i.e., 7 heard his various appeals or motions twice on different issues).

lawyer, who testified that he had met Petitioner in the Palm Beach County Jail in November, 1976. Petitioner and Coffin began communicating soon thereafter. The communication between Coffin and petitioner involved using a jail trusty, Richard Kane, as an intermediary because of the physical separation of the jail cells. Coffin testified that the petitioner sought his legal expertise and knowledge, and at the petitioner's request, Coffin agreed to prepare a civil suit against the Sheriff's Office, State Attorney's Office, and the Miami Herald.

Coffin testified that he instructed Kane to obtain from the petitioner a copy of the newspaper article which was to be the basis for the suit, and that shortly thereafter he received this article from Kane. Coffin later gave petitioner, through Kane, certain legal pleadings, as well as various documents pertaining to a possible insanity defense for the petitioner. Coffin also drafted a letter to be sent by the petitioner to the ACLU.

Coffin testified that in December, 1976, he and the petitioner met briefly in a jail elevator, at which time the petitioner admitted killing Richard Kreusler. Coffin stated that about an hour later, he received a note delivered by Kane which explained the circumstances surrounding the Kreusler killing. This note, State's Exhibits 47 and 48, explained that the petitioner had been cheated in a narcotics transaction by Billy Glocker, the son of the Kreusler's next-door neighbors. According to Coffin, the note recited that on the night of the shooting, the petitioner had been under the influence of morphine and dilaudid and, intending to shoot Billy Glocker, went to the wrong house and mistakenly shot Kreusler.

Coffin testified that he told his lawyer about the note and authorized her to discuss the matter with a friend and fellow attorney. Coffin indicated that he had been reluctant to get involved in the matter because of fear for his safety. Eventually Coffin authorized his attorney to turn the letter over to the State Attorney's Office if they could ensure his safety. Coffin agreed to testify for the state at the petitioner's trial if the state would agree to stand mute on his pending motion for sentence reduction, with the understanding that if the documents provided by Coffin did not prove to be genuine, the State Attorney's Office could file charges against Coffin for manufacturing evidence.

Dexter Coffin's attorneys, David Roth, Carol Crosswell Smith and Bryant Sims, were also called by the State to corroborate Dexter Coffin's testimony relating to the "confession" and to Coffin's agreement with the Palm Beach State Attorney.

The trusty in the transactions, Richard Kane, stated that it was he who originally told the petitioner about Dexter Coffin's status as a jailhouse lawyer. He also testified that he had carried communications between the petitioner and Coffin. He specifically recalled two notes sent by the petitioner to Coffin, one pertaining to a civil suit and another relating to the ACLU letter. Kane recalled reading two notes from Coffin which dealt with the ACLU, Baker Act and Coffin's knowledge of the Kreusler murder. He also recalled relaying a communication from the petitioner to a bail bondsman, as well as various messages between Dexter Coffin and the petitioner about a possible insanity defense. Kane testified that he had never told Coffin that any letter he delivered had come from the petitioner unless the petitioner had, in fact, sent the communication.

According to Kane, whenever the communications between the petitioner and Coffin were folded, he did not read them. Consequently, when the prosecutor asked Kane to read silently Exhibits 47 and 48, the alleged confession of the petitioner, Kane stated unequivocally that he had not read those documents while he was at the jail.

### COFFIN'S TESTIMONY: THE "CONFESSION"

As noted earlier, the so-called written confession of the petitioner (Exhibits 47 and 48) was not admitted into evidence because the prosecution could not prove that the exhibits were genuine. The state did not produce a handwriting expert who

could conclusively testify that the petitioner had authored Exhibits 47 and 48. Following the successful exclusion of Exhibits 47 and 48 and after both sides had rested, defense counsel moved to strike all references to Exhibits 47 and 48.

Although Exhibits 47 and 48 were not received in evidence, Dexter Coffin was permitted to testify that he had summarized the contents of these documents in Exhibit 56, a four-page statement written by Coffin to one of his lawyers during a jailhouse visit.

Coffin stated he was afraid that the interview room was bugged so he wrote down what he intended to communicate. When the prosecutor began to question Coffin about this document, defense counsel objected on best evidence grounds; after the objection was overruled. The document was moved into evidence as follows:

BY MR. SCAROLA (Assistant State Attorney):

Q Mr. Coffin, at this time I show you what has been marked as State's Exhibit 56 for identification purposes only and ask you whether or not you recognize that, sir?

A Yes, I do.

Q And what do you recognize it to be?

A That is the note that I wrote to Bryant Sims on the afternoon of December the 16th, 1976, when he came to the jail.

Q And is it in the same condition in which it was when you delivered it to Mr. Sims on that date?

A It appears to be. There are some notations in the upper right-hand corner that were not there before, but otherwise, it is.

Q Other than that notation or those notations, any substantial difference in the text of the document?

A None at all.

MR. SCAROLA: Your Honor, at this time I would move State's Exhibit Number 56 for identification purposes only into evidence as the best evidence of the communication.

THE COURT: May I see that?

MR. SCAROLA: Thank you.

THE COURT: Any objection?

MR. SEPE (Defense Counsel): No objection.

THE COURT: All right, receive it in evidence, then, without objection, as Exhibit 56.

(Whereupon, State's Exhibit Number 56 for identification was received into evidence)

MR. SCAROLA: Thank you, Your Honor. I'd request permission to have Mr. Coffin publish the contents of that exhibit to the jury by reading it.

THE COURT: All right, sir.

BY MR. SCAROLA:

Q Would you do that, please, Mr. Coffin, at this time?

A Yes, sir.

"Mark had heard of my habit or whatever of preparing my own petitions, motions and other papers. He also is well-aware from having read the papers of the instances in which I have submitted myself for psychiatric evaluation. In keeping with this, about a week or ten days after he was convicted on the drug and gun charges, he started sending a certain trusty, Richard Kane, over to my cell to ask questions on points of law, suits against newspapers and general nonsense. He sent me to prepare a complaint against them for him.

In the meantime, he went to court with Brian Brennan and filed the notice of appeal at this hearing. On filing this motion, Brian was also permitted to withdraw and the PD's office was assigned to represent Mark on his appeal.

Mark returned from this hearing very upset. Within a couple of hours, the above trusty had gone back and forth between us delivering messages, et cetera, regarding Mark's interest in possibly moving the court to have him evaluated by a psychiatrist. I explained all of the ramifications as I knew them, to the trusty and hence to Mark.

I then saw Mark on the following Wednesday, our visiting day, and we discussed the possibility of the above as well as certain aspects of the Kreusler crime itself. At this time, I asked Mark if, in fact, he did it.

He winked, smiled a little grin and he said, 'Yes.' I whistled and that was it, until the following morning when Kane, trusty, came down to my cell and started asking me for Mark about the law concerning being declared insane.

I sent to Mark a handwritten copy of the Baker Act that I had made while at Anclote Manor. He returned it along with the message that I should draw up a draft for him to get the idea before the court.

I wrote him and suggested that he write me and explain to me how he felt that he would be able to get it through, as there was no basis for it. He said that, in the note, he was stoned on Morphine and Dilaudid at the time he went to the Kreusler's house thinking it was Armand Glocker's house as he was after Billy, Armand's son, who had apparently burned him on a prior dope deal involving the fact that he and Billy had a deal whereby Billy would, or may still, get Morphine from the Veterans Administration Hospital in Miami and Mark was paying handsomely for it.

He rang the bell, crouched down and when he heard footsteps, shot the gun. Therefore, he thinks that as a result of, one, it happened while he was stoned; and two, that he does have a dope problem; and three, that he didn't even come close to getting the person he was after, he would be a prime A Number One candidate for a mental institution.

Further, he knows he's facing, and quite sure he's going to get, 50 years on the other charges for which he's awaiting sentence and realizes that parole is a long way off, at best. He feels that if he talks to a psychiatrist and forms the doctor-patient confidentiality thing, the doctor can't testify as to any crimes that he mi—might have committed—he might have admitted thinking and yet, can convince the doctor of his insanity. And if the doctor did somehow release the information, that since the case, and his cases to date, have received so much notoriety, that he could get all sorts of legal representation and help and could even more easily get the court to go along with the psychiatric evaluation and commitment.

All of the legal representation business, then, is the reason for the second letter wherein he requests that I write the ACLU for him.

In the meantime, though, Richard Kane stopped by about two and a half hours ago and we talked about the insanity procedure. The rule states that upon being declared sane again, the defendant—"and the symbol for the defendant is the legal symbol for the defendant, a triangle—"is returned to court for sentencing. Kane went to tell Mark this and I haven't heard the reaction yet."

Last page: "Inconclusive tests on that gun, but my point is that Mark has not told me pointblank that it was or was not the same gun. Essentially, the first two paragraphs go into the psychiatric business, then the letter goes something as follows, 'I was stoned on morphine and had snorted a number 4 Dilaudid and had had an agreement—an argument with Deb and then—and the more I thought about it, the madder I got and then I started to think about how screwed up I had gotten over the last year and then I thought about the money Billy had ripped me off for and I just got my gun, went over to the north end of Palm Beach, drove by the house a number of times, parked the car and walked to the house, walked right up to the door and rang the bell, stepped back, crouched down and when I heard footsteps, proceeded to pull the trigger.'

"The leter [sic] then goes on to say how he went home and crashed. The

next day he realized what he had done and that was that.

Oh, also I have a feeling that Brian Brennan knows about it. If not, he has a good idea."

That's the end of the note.

Belatedly, trial counsel moved during the charge conference to strike Exhibit 56. The trial judge pointed out that the exhibit was introduced because Mr. Sepe's original objection on best evidence grounds was overruled. [And it should be pointed out the exhibit was then admitted—in the form of testimony—on the prosecution's assertion it was the best evidence.) The judge refused to strike the exhibit, but agreed to instruct the jury that the document had not been introduced to prove the truth of its contents.

## PROCEDURAL HISTORY

At the close of Petitioner's trial the jury retired to deliberate. The jury rendered a verdict of guilty to the charge of First Degree Murder on February 22, 1978. On April 26, 1978, petitioner was adjudicated guilty by Judge Thomas E. Sholts, Jr. and sentenced to life imprisonment with a mandatory minimum term of 25 years.

Petitioner filed a timely Notice of Appeal. On March 25, 1981, his conviction was affirmed by the Fourth District Court of Appeal. *Herman v. State*, 396 So.2d 222 (Fla. 4th DCA 1981). (JJ Cobb, Upchuck and Sharp) Likewise, the seven member panel of the Florida Supreme Court dismissed petitioner's Petition for Writ of Certiorari, without opinion on June 16, 1981. *Herman v. State*, 402 So.2d 610. (C.J. Sundberg; J.J. Adkins, Boyd, Overton, Alderman, McDonald, Ehrlich).

Petitioner filed an Application for Leave to Petition for Writ of Errors *Coram Nobis* on January 21, 1985. Petitioner asserted that the recantations of three trial witnesses constituted newly discovered evidence which entitled him to a new trial. The Fourth District Court of Appeals denied petitioner's application on May 30, 1985. (J.J. Walden, Downey and Hurley). The

seven member Florida Supreme Court declined to accept jurisdiction, without opinion, on November 26, 1985. *Herman v. State*, 480 So.2d 1294 (1985). (C.J. Boyd; J.J. Adkins, Overton, McDonald, Ehrlich, Shaw, Barkett).

Petitioner filed for a Motion for Post-Conviction Relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure on October 15, 1985. The motion was based on petitioner's contention that he received ineffective assistance of trial counsel. After a lengthy evidentiary hearing before Circuit Court Judge William C. Owen, Jr., the motion was denied on April 22, 1986. The Fourth District Court of Appeal affirmed the order of the trial court in a per curiam opinion. *Herman v. State*, 517 So.2d 30 (Fla. 4th D.C.A.1987) (JJ. Orfinger, Cobb, Sharp)

The petitioner filed the instant petition for writ of habeas corpus on February 22, 1988.

Respondent concedes that state remedies have been exhausted. Failure to exhaust state remedies is therefore not an issue in this proceeding.

U.S. Magistrate Lurana S. Snow recommended that Mark Herman's Petition for Writ of Habeas Corpus be granted.

Particularly, the Report and Recommendation found that if the decision by petitioner's counsel to "permit references to Exhibits 47 and 48 was "ill-chosen", the failure to object to Exhibit 56 was "inexcusable". *Id.* at 39. Of course, defense counsel had objected on best evidence grounds, was overruled and did not repeate the objection when the prosecutor offered it as the best evidence.[2]

The Report and Recommendation found that petitioner's other assertions of error were, standing alone, "well within the range of reasonable professional judgment" but felt it showed counsel to be too ill to mount a defense. *Id.* at 41. The Report and Recommendation does point out that the failure to engage a handwriting

---

2. Going beyond the scope of a Report and Recommendation, Magistrate Snow expressed "serious doubt as to the guilt of Petitioner. Report and Recommendation, page 42.

analyst and to pursue additional defense possibilities provided by an investigator (whom defense counsel admittedly did not trust) is incongruous to the defense strategy pursued. *Id.*

The Report and Recommendation reaches the conclusion that the petition for writ of habeas corpus should be granted, but not on the grounds that trial counsel was incompetent. Rather, the Report and Recommendation finds that trial counsel was "rendered ineffective by the lack of time to fully recover from his illness and properly prepare for trial." *Id.* at 47. The Report and Recommendation finds that the trial court's unexplained refusal to grant trial counsel a continuance denied petitioner his right to a fair trial by rendering trial counsel ineffective. *Id.*

The Report and Recommendation falters at this point. The two (2) pronged analysis of *Strickland v. Washington,* applies to determine whether trial counsel was incompetent. *Strickland,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674. The two (2) pronged *Strickland* analysis states:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Ibid.

The Report and Recommendation errs because it does not apply the *Strickland* analysis to the immediate petition. Instead, the Report and Recommendation finds fault with the trial judge. If the error lies with the trial judge's failure to grant a continuance, an entirely different constitutional inquiry is required.

 In order for the denial of a continuance to be grounds for granting the petition for habeas corpus, petitioner must show that: (1) the denial was an abuse of the trial court's discretion; and (2) the

abuse must be so arbitrary and fundamentally unfair so as to constitute a violation of due process. *Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Cir. Unit B, 1981). The *Hicks* burden is extreme; indeed, the petitioner has failed to brief the issue at all. A review of the record in this matter leads this Court to conclude that petitioner would be unable to show that the trial court abused its discretion in failing to grant the continuance. *Raulerson v. Wainwright,* 732 F.2d 803 (11th Cir.1984).

A review of the chronology leading up to the trial is helpful. The record indicates that defense counsel previously sought and obtained a continuance on June 27, 1977. Also, in November of 1977, defense counsel requested a February, 1978 trial, a request the trial judge accommodated.

The trial date was set at February 6, 1978. Defense counsel filed a motion for continuance on January 12, 1978, and again on February 2, 1978. Both motions were denied; the February 2 motion was denied after a hearing on the matter. Defense counsel did not allege his ill health as a reason for requesting a continuance in either motion to continue. It does not follow that the trial court judge could "render trial counsel ineffective" by forcing defense counsel to conduct a trial while in ill health, when the trial court judge had no assertion of ill health of defense counsel at the time the rulings were made that would have required a continuance.

This court is in agreement with the Fourth District Court of Appeals that the six month discovery period, the open file discovery, the opportunity to depose each state witness prior to their testimony and the scheduling of the trial date six months in advance of trial all combine to lead to the conclusion that the trial court judge did not violate the broad discretionary latitude granted in matters of requested continuances. *Herman v. State,* 396 So.2d 222, 227 (Fla.App. 4th Dist.1981); *See Unger v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).

This court is likewise not unmindful of the fact that the petition does not allege,

nor does it seek to prove that the trial court abused its discretion. This court does not find that defense counsel was rendered ineffective by the trial court's failure to grant a continuance. Thus, the consideration of Herman's petition must necessarily turn upon whether defendant's trial counsel was actually ineffective.

■ The yardstick for measuring any claim of ineffective assistance of counsel is whether the counsel's conduct deprives the defendant of his or her constitutional right to a fair trial. *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063. This court must squarely address the question of whether defense counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

Petitioner asserts that trial counsel was incompetent at three critical aspects of the trial.

1. Failure to object to the admission into evidence of a document ("Exhibit 56") written by a state witness, purporting to recite the details of petitioner's alleged confession, contained in two documents (Exhibit 47 and 48) which were not themselves admitted into evidence. Also trial counsel permitted reference to the properly excluded Exhibits 47 and 48 throughout the course of the trial.

2. Failure to hire a questioned documents examiner to rebut the State's claims that the purported confessions (Exhibits 47 and 48) were authored by petitioner.

3. Trial counsel's failure to conduct a pretrial investigation and neglecting to call witnesses who could testify that others had a motive to kill the victim.

■ This court is asked to determine whether actions of trial counsel in regard to the three enumerated aspects of trial counsel's representation are reasonable under prevailing professional norms, considering the circumstances at issue. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. This determination is not made with the benefit of hindsight, but must rather be made from the perspective of counsel at the time of the performance of his duties. *Id.* at 689, 104 S.Ct. at 2065.

■ Having said this, this Court is not required to determine whether trial counsel's performance was deficient prior to an examination of any prejudice suffered by Herman as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. Since the two prongs of the *Strickland* test for ineffective assistance of counsel are conjunctive, the "prejudice prong" of Strickland serves as an entry point into the Court's analysis. If Petitioner's trial counsel is found to be ineffective, relief cannot issue unless defense counsel's errors also had prejudiced the outcome of the trial. Consequently, if no prejudice is found, there is no need for the Court to engage in an inquiry concerning defense counsel's representation of Petitioner. *Id.* at 691, 104 S.Ct. at 2066. The prejudice inquiry is the linchpin of any inquiry into the Sixth Amendment claim of ineffective assistance of counsel.

The prejudice prong of the *Strickland* test inquires whether "there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different." *Id*, at 694, 104 S.Ct. at 2068. *Strickland* defines a reasonable probability as a probability sufficient to undermine confidence in the outcome of the trial. *Id.* This Court is required to examine the totality of the evidence presented in the trial of *State v. Herman.* The Court must then decide whether the jury, absent the alleged errors, would have had a reasonable doubt as to the guilt of Herman. *Chatom v. White*, 858 F.2d 1479 (11th Cir.1988).

*Strickland* provides these guidelines as follows:

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will

have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. *Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.* (emphasis added.)

*Id.* 466 U.S. at 695–96, 104 S.Ct. at 2069.

 This Court has taken the time to review the entirety of the evidence. As a result, the Court concludes that Petitioner has not borne his burden of showing that a verdict other than guilty would have been reached absent the errors. Unlike *Chatom,* this is not a case where the guilty verdict is "weakly supported by the record." *Strickland,* 466 at 696, 104 S.Ct. at 2069. Although evidence supporting the guilty verdict might not be characterized as "overwhelming", nevertheless it is quite substantial.

Even if there were any errors of counsel which resulted in the admission of inadmissible parts of Exhibit 56 and the references to Exhibits 47 and 48, the unaffected evidence is very substantial and includes, inter alia, Herman's confession of the murder to three (3) testifying witnesses: David Wayne Gibson, Gerard Denono and Dexter Coffin, III. Defense counsel attempted vigorously to impeach the credibility of these three (3) witnesses, especially as each was an incarcerated felon at the time of trial.

Additional evidence at Herman's trial corroborated the essence of Herman's confessions, that he had mistakenly murdered the wrong victim. Arthur Baines testified that Herman told him Kreusler's murder was an accident. Debra Altman testified that Herman knew and was angry over the

fact that Billy Glocker, the alleged intended victim, owed Herman money. Frank Laiser testified that his brother Steve Laiser, Herman's close friend, owned a 1969 Corvette. A 1969 Corvette was reputedly the type of vehicle seen by eyewitnesses at the time of the slaying. The testimony by these three witnesses, Baines, Altman and Laiser, bolsters the substance of Herman's confession as relayed by Denono, Coffin and Gibson. Additional evidence corroborates other portions of Coffin's testimony.

Further testimony established that Herman had knowledge of specifics of the slaying that only someone present at the scene of the murder would possess. Herman told Officer Sheets of the killer "crouching down" behind the bushes after ringing the victim's doorbell. This fact was never made public prior to Officer Sheet's interview with Herman. Sergeant Roche's testimony established that even before Herman was a suspect, Herman became visibly nervous and shaken when asked about the Kreusler homicide.

Finally, the admission of the murder weapon, the 12 gauge shotgun deserves a measure of weight. Though it was impossible to determine beyond a shadow of a doubt whether Herman's pump shotgun was the murder weapon, the admissibility of the gun was not erroneous; so this Court can find no reason to question the admissibility of the shotgun as the murder weapon. *See Herman v. State,* 396 So.2d 222, 229 (Fla. 4th D.C.A.1981).

The jurors put all this evidence together and found it spelled GUILTY, as they had every basis and right to do.

Assuming, arguendo, that Exhibit 56 was improperly admitted, the overall effect was to foreshadow testimony available from other witnesses. The testimony of Richard Kane and Linda Braswell established Herman's communication with Coffin through Kane, as trusty. Though the Court need not decide the issue, it is likely that Coffin would have been able to testify to much of the contents of Exhibit 56, once an adequate predicate was established, through Kane, Braswell and Denono—and certainly he could testify as to Herman's admission

of guilt to Coffin in a face-to-face conversation.

Simply put, aside from the allegedly improperly admitted evidence, Herman confessed the crime to three different people. Herman also provided additional bits of information to others such that his confessions, most notably the details of the "Denono" confession, were corroborated. Elimination of parts of the "Coffin" confession contained in Exhibit 56 does not alter Herman's other inculpatory statements. It is unreasonable to believe that exclusion of Exhibit 56 would have made the totality of the remaining testimony qualitatively less believable. The totality of the evidence of Herman's guilt, exclusive of the alleged errors, is nonetheless substantial. The alleged errors cannot be held to have caused an outcome not otherwise likely.

### DIFFERENCE BETWEEN THE HERMAN TRIAL AND THE CHATOM TRIAL

A quick reading of the recent decision of *Chatom v. White*, 858 F.2d 1479 (11th Cir. 1988), reveals first-blush similarities which would require granting the petition; however, closer scrutiny reveals major and significant differences between *Chatom* and *Herman*.

Four major differences spring quickly to mind, and will be discussed here. First, the key evidentiary matter in *Chatom* was a fairly new chemical test of somewhat suspect reliability and validity. The Herman trial involved nothing but good old-fashioned weighing of credibility by the jurors. And the Herman jurors had plenty of testimony and other evidence to evaluate.

Second, in *Chatom* the jury had no other clues as to the credibility of the key witness with reference to the chemical test; on the other hand, the Herman jury had witness after witness on various aspects of the case and several from whom the jury could determine credibility of the key witness attacked by Herman's petition. The Herman jury had numerous corroborating witnesses and some contradictory or incon-

clusive evidence to evaluate. By contrast, the *Chatom* jury was left with virtually a Hobson's choice.

Third, in the *Chatom* case the defense attorney did not object, while in *Herman*, his attorney objected—albeit giving the wrong ground as a basis—but Herman's attorney did succeed both in getting the trial judge to give an extremely limiting instruction, and in preventing the exhibit from going back to the jury room.

■ The fourth major distinction is that in *Chatom* the Alabama State Court of Appeals reversed the conviction and the Alabama Supreme Court barely upheld the conviction by 5 to 4 majority, whereas, in Herman the tally has been a unanimous holding against Herman's positions by Florida judge after Florida judge, trial and appellate; in fact, it sounds like a football score, 17–0.[3] Although that tally does not control disposition of this habeas corpus petition, it is an appropriate matter for this court to consider, as did the Eleventh Circuit Court of Appeals in *Chatom*, at p. 1487.

The other two assertions of error are considerably weaker, as can be readily seen.

It should be noted that Judge Owen found Herman's claim he had specifically requested his counsel to call witnesses and get a handwriting expert "not to be credible."

### LACK OF HANDWRITING EXPERT

■ Another alleged error of counsel, failure to employ a qualified handwriting analyst for Herman's defense, presented no prejudice to Herman's cause. As it was, the handwriting experts offered by the State offered inconclusive evidence as to the identity of the author of Exhibits 46 and 47; hence, the exhibits were *not* received into evidence. Further, had defendant's trial counsel been able to obtain an expert to testify conclusively that Herman did not author the documents, the impact of that testimony would be diluted by the

---

**3.** Seven state court judges confronted Petition-
er's appeals more than once.

State's experts. Plus, it would have prevented defendant, under state practice, from the right to close in final argument. *Elledge v. Dugger*, 823 F.2d 1439, 1447 (11th Cir.1987). This Court is in agreement with and hereby adopts Judge William C. Owens, Jr.'s findings of fact, item #7, contained in the Rule 3.850 hearing opinion.[4] *Sumner*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The failure to obtain a handwriting expert presented no prejudice to Herman's cause.

## INVESTIGATIVE "LEADS"

■ The focus of petitioner's allegation that trial counsel was ineffective in failing to conduct pre-trial investigations stems primarily from three sources. First, petitioner alleges that trial counsel failed to investigate and follow up leads established as a result of the investigation by one Virginia Snyder.[5] The record convinces this court that trial counsel was not acting unreasonably when he disregarded Ms. Snyder's "discoveries".

Additionally, petitioner asserts trial counsel was ineffective for failing to call witnesses to the stand to establish that other people had a motive to murder Mr. Kreusler. Further, these "witnesses" were part and parcel of Ms. Snyder's findings. Trial counsel must be afforded the latitude to decline to utilize witnesses whom he does not himself believe, especially witnesses whose testimony is most likely excludible as irrelevant. *See Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir.1980) (mere fact defense counsel has not pursued every conceivable line of inquiry in a case does not constitute ineffective assistance of counsel).

■ Importantly, defense counsel's decision to forego presenting testimony in favor of having the opportunity to address the jury for the final time prior to deliberations is not unreasonable. *Clark v. Dugger*, 834 F.2d 1561, 1567 (11th Cir.1987). Under Rule 3.250 of the Florida Rules of Criminal Procedure, a defendant who offers no testimony in his own behalf, save his own, may close with the final argument to the jury. Every practicing criminal attorney in the State of Florida must weigh the strategic advantage of having the final word to the jury, against the relative strengths and merits of presenting testimony—particularly, weak testimony—on behalf of his client.[6]

■ Likewise trial counsel's failure to rebut the testimony of the convicted felons the State utilized to convict petitioner—in view of vigorous impeachment—is reasonable in that the record indicates the decision was an informed, reasonable strategic choice.[7]

This court holds that petitioner has failed to bear his *Strickland* burden as it regards the claim of ineffective assistance of counsel pertaining to the alleged failure to investigate.

## CONCLUSION

This court, along with the unanimous conclusion of 17 state court judges who've

---

4. Item #7 of the findings of fact from the Rule 3.850 hearing opinion provides as follows:

Mr. Sepe's failure to investigate and/or locate a questioned documents examiner who would so testify was a tactical decision made by him on the basis of facts then known to him, to wit: if either or both of the questioned document examiners who had already examined the document were called as witnesses, they would testify that they were unable to say that the Defendant had authored the document; that in Mr. Sepe's opinion such testimony in and of itself appeared to create a reasonable doubt as to the authenticity and authorship of the document, such that the securing of an additional expert presented as much risk of causing harm as it did of conferring a benefit.

5. Item #8 provides:

Mr. Sepe did not use or rely upon the information gathered by the investigator, Virginia Snyder, and his failure or refusal to do so was a tactical decision on his part explained by his lack of confidence in the investigator's abilities and integrity.

6. Item #13 of Judge Owens' findings of fact from the Rule 3.850 hearing opinion states:

Mr. Sepe's decision not to call William Glocker or other persons as defense witnesses was a considered tactical decision.

7. The Court notes that any additional testimony impeaching the reputation of the State's witnesses would be cumulative of statements elicited by defense counsel on cross-examination and conceded by the State throughout the trial.

considered various aspects of Petitioner's appeals and post trial motions, finds no merit in Herman's petition. It is DENIED.

DONE AND ORDERED.